(No. 66980.—

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. WALTER THOMAS, Appellant.

*Opinion filed July 3, 1990.—Rehearing denied October 1, 1990.*

502

504

506

508

CLARK, J., concurring in part and dissenting in part.

Charles M. Schiedel, Deputy Defender, and Allen H. Andrews, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

Neil F. Hartigan, Attorney General, of Springfield (Robert J. Ruiz, Solicitor General, and Terence M. Madsen and Kenneth A. Fedinets, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE RYAN delivered the opinion of the court:

Defendant, Walter Thomas, was indicted by a Du Page County grand jury on four counts of murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1), two counts of burglary (Ill. Rev. Stat. 1985, ch. 38, par. 19—1(a)), two counts of arson (Ill. Rev. Stat. 1985, ch. 38, par. 20—1(a)) and one count of aggravated arson (Ill. Rev. Stat. 1985, ch. 38, par. 20—1.1). A jury found defendant guilty of each offense. After separate hearings concerning the question of whether to impose the death penalty, the same jury found that Thomas was eligible for the death penalty and found that there were not sufficient mitigating factors to preclude imposing the death sentence (Ill. Rev. Stat. 1985, ch. 38, par. 9—1). The trial court then sentenced Thomas to death.

The trial court also sentenced defendant to prison terms of seven years for burglary and 50 years for aggravated arson. The arson charge merged with the aggravated arson count. Defendant's death sentence was stayed (107 Ill. 2d R. 609(a)) pending direct appeal to this court (107 Ill. 2d R. 603). We affirm the convictions and the sentences.

## Facts

The facts are essentially as follows. On the morning

of November 26, 1986, Detective James Davis of the Aurora police department investigated the scene of an apparent murder and arson at 302 Windstream in Aurora. There he found the body of Sophie Darlene Dudek on the floor of her garage. He observed fire damage in the rear of the garage and in the car that was parked there. He also found a broken perfume bottle. The perfume was used as an accelerant in the fire.

Detective Davis then spoke with Allen Albus, who stated that earlier that morning he saw a black man, wearing a gray hooded sweat shirt, walking in front of Dudek's garage. Albus stated that several minutes later he saw smoke coming from the garage. Donnie Moore, who was defendant's employer, later informed Detective Davis that defendant was the leader of a cleaning crew that was working at Dudek's building on the day of the murder, and that defendant was wearing a gray hooded sweat shirt on that day.

Detective Davis, along with several other officers, later contacted Thomas, brought him to the Aurora police station and questioned him extensively. Defendant was again questioned on a different day. During the second day of interrogation, Thomas orally confessed and then signed a written statement in which he admitted committing the crimes with which he was charged.

Thomas stated in his confession that he had entered Dudek's garage, where she stored a large quantity of perfume that she was in the business of selling. Defendant stated that he opened a bottle of perfume, which he planned to remove from the garage, and that it fell on the floor, at which time Dudek entered the garage. Thomas stated that he tried to leave the garage but Dudek grabbed the back of his sweat shirt and began to scream. Defendant then, according to his written statement, removed a butterfly knife from his pocket and stabbed Dudek repeatedly. One of the stab wounds sev-

ered her spinal cord, killing her instantly. Thomas stated that he then poured perfume throughout the garage, in the car and on decedent's body, set it on fire with the hope of concealing the murder, and then left, later disposing of the knife. Based on this confession, and on other physical evidence, the indictments were forthcoming.

The trial court made several rulings before trial that defendant challenges in this appeal. The trial court denied two defense motions to suppress evidence and four motions to declare the Illinois death penalty statute unconstitutional. It granted the State's motion to strike defendant's motion *in limine* that sought to exclude evidence derived from the process of electrophoresis. The trial court also refused to permit questioning of the panel of prospective jurors regarding any preconceptions they had regarding Illinois parole law.

At trial, the State called Albus and Moore. It also called several law enforcement officials who testified generally as to the condition of the crime scene and decedent's body, and the circumstances surrounding defendant's confession. Following the presentation of the State's and the defendant's evidence, the jury returned guilty verdicts for all the crimes charged.

The court held a sentencing hearing following the trial. After the first phase, the jury found that defendant was eligible for the death penalty because he was 18 years of age or older, and he committed murder in the course of another felony. During the second stage of the sentencing hearing, the State presented the testimony of two women who stated that Mr. Thomas had attacked them in earlier incidents. The court admitted into evidence five certified copies of prior convictions that indicated defendant's prior delinquency adjudications for aggravated battery, aggravated assault and armed robbery. As an adult, Thomas had also entered pleas in later cases for rape, attempted rape and armed robbery.

Thomas presented testimony from his family, neighbors and friends in mitigation.

Following the second phase of the sentencing hearing, the jury determined that there were not sufficient mitigating circumstances to preclude imposition of the death sentence. The trial court sentenced defendant to death for the murder and sentenced defendant to prison terms for the other individual felonies, except for arson, which had merged into the aggravated arson conviction.

Defendant raises 16 issues in this appeal. We will address them serially. The relevant facts will be further adduced as they pertain to the various issues.

## Defendant's Confession

Defendant first argues that the trial court erred by not suppressing his confession because, defendant contends, law enforcement authorities obtained it in violation of his fifth and fourteenth amendment rights. The trial court held hearings on defendant's motion to suppress that extended over two months. The State called several law enforcement officials who were present during the interrogation of defendant. These individuals testified generally that they suspected defendant after speaking to Albus and Moore, and after finding that defendant had an extensive criminal record. The police then contacted defendant on November 28, 1986, in the early afternoon, two days following the murder. Thomas was brought to the Aurora police station, where he remained for 12 hours, during which time he was interrogated, his pants were taken from him to be tested for apparent bloodstains, and he was required to wear a paper suit. Defendant also signed a written waiver in which he permitted police to search his residence and specifically allowed police to remove certain enumerated items.

At approximately midnight, several officers, leaving in two squad cars, drove defendant to his apartment. The trip was somewhat delayed because one of the cars experienced mechanical difficulty along the way. When they arrived at defendant's apartment, several officers searched it and removed several items, including some items that were not listed on the waiver. The trial court suppressed the use of these items that were not listed on the waiver.

Thomas returned, without police escort, to the Aurora police station on December 22, 1986, accompanied by his mother and her friend. There, defendant was interrogated extensively, and he provided blood and hair samples. A polygraph examiner, Robert Cummins, was then brought in. Cummins is also a trained interrogator. Defendant was advised of his rights pursuant to *Miranda v. Arizona* (1966), 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602, and was interrogated repeatedly throughout the day. Additionally, Detective Davis showed Thomas a newspaper clipping about an execution by lethal injection that occurred in Texas.

During the evening, police took defendant, his mother and her friend to a restaurant across the street from the station for dinner. After dinner, Cummins administered a polygraph test of Thomas. Cummins also applied what he calls a "nine stage" interrogation technique, which basically provides an outline for the interrogator's method of questioning. Defendant confessed to commission of the crimes soon thereafter.

The trial court refused to suppress defendant's confession. The court found that, while the interrogations were lengthy, no coercion or threats were involved. Thomas was provided food and drink, and he was told that he could leave if he so wished, although admittedly this would have been difficult during the first day of in-

terrogation when defendant had no transportation and no pants.

This court stated the proper standard of review with regard to questions about the voluntariness of confessions in *People v. Prim* (1972), 53 Ill. 2d 62, 70:

> "Whether a statement is voluntarily given depends upon the totality of the circumstances. The test is whether it has been made freely, voluntarily and without compulsion or inducement of any sort or whether the defendant's will was overcome at the time he confessed. [Citation.] In making its decision the trial court need not be convinced beyond a reasonable doubt, and the finding of the trial court that the statement was voluntary will not be disturbed unless it is contrary to the manifest weight of the evidence. [Citation.]"

The trial court's finding in this case is not contrary to the manifest weight of the evidence. There is no evidence in the record to indicate that defendant felt constrained or intimidated in any way. He consented freely to interrogation and testing. While the interrogations were lengthy at times, the evidence indicates that defendant knew he was free to leave and chose instead to remain.

The mere fact that Cummins administered a polygraph test of defendant shortly before defendant confessed does not necessitate a finding of involuntariness. For various reasons we have disallowed the use of polygraph examination results as evidence; however, this court has not denied law enforcement officials the use of this technique as an investigative tool. In the present case, defendant agreed to take the test. He cannot, therefore, persuasively argue that his confession was coerced by a test that he voluntarily took.

We also conclude that the production of the newspaper article concerning a death sentence in Texas does not render defendant's confession involuntary. There is

no evidence that defendant actually read the article or was disturbed by it, and it was shown to him several hours before he confessed. As such, we cannot find that the trial court's determination was contrary to the manifest weight of the evidence.

### Electrophoresis

Defendant next challenges the trial court's refusal to hold a hearing pursuant to *Frye v. United States* (D.C. Cir. 1923), 293 F. 1013, to determine whether the process of electrophoresis is generally accepted in the relevant scientific community and, therefore, reliable as evidence. This court recognizes the *Frye* standard, which prohibits the use of evidence that has not gained general acceptance within the relevant scientific community. (See *People v. Baynes* (1981), 88 Ill. 2d 225, 241.) Application of the process of electrophoresis to defendant's case revealed that all four of the enzymes that were detected in the dried blood found on defendant's clothing were consistent with the blood of the decedent. The trial court granted the State's motion to strike defendant's motion *in limine* for a *Frye* hearing relying, in part, upon *People v. Partee* (1987), 157 Ill. App. 3d 231.

In *Partee*, the Appellate Court, First District, outlined in depth the process of electrophoresis and its evidentiary status in various courts. The *Partee* court concluded that, as a matter of law, "electrophoresis is generally accepted by forensic scientists as a reliable method of detecting genetic markers in blood and is therefore admissible in a court of law." (157 Ill. App. 3d at 261.) The court noted that the concerns with the reliability of the process involve its application in particular instances, not the process itself. Recently, in *People v. Eyler* (1989), 133 Ill. 2d 173, 215, this court considered the question now before us and stated:

"We agree with the reasoning and conclusion of the court in *Partee*, and hold that electrophoresis is generally accepted by forensic scientists as a reliable method of detecting genetic markers in blood and is therefore admissible. Accord *People v. Redman* (1985), 135 Ill. App. 3d 534; *People v. Reilly* (1987), 196 Cal. App. 3d 1127, 242 Cal. Rptr. 496; *State v. Washington* (1981), 229 Kan. 47, 622 P.2d 986; *Robinson v. State* (1981), 47 Md. App. 558, 425 A.2d 211; *contra People v. Young* (1986), 425 Mich. 470, 391 N.W.2d 270. See also Annot., *Admissibility, in Criminal Cases, of Evidence of Electrophoresis of Dried Evidentiary Bloodstains*, 66 A.L.R.4th 588 (1988) (of the decisions analyzed, courts from 10 jurisdictions have held the testimony to be admissible; only one jurisdiction, Michigan, has held to the contrary)."

In the present case, the trial court properly relied upon the *Partee* decision, with which we concur, in forgoing a hearing on the general scientific acceptance of electrophoresis. The *Partee* decision allowed the trial court in this case to effectively take judicial notice of the fact that the relevant scientific community, that is, the community of forensic scientists, has determined that the process itself is reliable. Defendant's challenges to the process, therefore, were held in the proper forum; that is, in front of the jury by cross-examination of prosecution witnesses and presentation of defendant's own witnesses. The trial court was not required to make a determination independent of that made in *Partee* absent some additional information to which the *Partee* court was not privy.

## Burglary Conviction

Defendant's third point of error involves his burglary conviction. He contends that the facts, as presented by the State, establish that he committed, if anything, residential burglary rather than burglary. As such, he ar-

gues, he was improperly charged and convicted. We reject this argument.

The decedent's body was found in her garage. This garage is part of a multiunit structure. All of the living units and garage units are attached and are under the same roof. Decedent stored perfume products in her garage, which provided defendant with the incentive to enter it.

Given these facts, the prosecution chose to charge defendant with burglary, rather than residential burglary. The crime of residential burglary was severed from the burglary statute in 1982 to create a four-year mandatory sentence for those convicted of entering the dwelling place of another without authority to do so. We held, in *People v. Bales* (1985), 108 Ill. 2d 182, that the residential burglary statute is constitutional because it is distinct from the crime of burglary and, therefore, it does not confer unbridled discretion upon the State to choose which crime to charge. Defendant argues in the present case that, because he entered decedent's attached garage, he committed residential burglary. Therefore, defendant argues, to allow the State to charge him with burglary illustrates an instance in which the State has acted arbitrarily. We disagree.

We hold here that an attached garage is not necessarily a "dwelling" within the meaning of the residential burglary statute. In *Bales*, we stated that a dwelling is a structure that is "used by another as a residence or living quarters in which the owners or occupants actually reside." (108 Ill. 2d at 191.) This definition was later essentially codified by the legislature in the statute defining "dwelling." (Ill. Rev. Stat. 1987, ch. 38, par. 2—6(b).) A garage, at least in this instance, whether attached to the various living units or not, cannot be deemed a residence or living quarters. As such, the prosecution, armed with the residential burglary statute (Ill. Rev.

Stat. 1985, ch. 38, par. 19—3) and *Bales*, appropriately determined that defendant Thomas should be charged with burglary. Ill. Rev. Stat. 1985, ch. 38, par. 19—1.

We understand that the conclusion in this case is contrary to that in *People v. Dawson* (1983), 116 Ill. App. 3d 672, which involved essentially the same facts, and held that one who enters another person's attached garage commits residential burglary. *Dawson*, however, was decided before this court decided *Bales* and before the legislature adopted the new definition of "dwelling." Our decision today is not, therefore, necessarily inconsistent with the reasoning in *Dawson*. We leave to another day the question of whether the entry of an unoccupied portion of the second floor (*People v. Suane* (1987), 164 Ill. App. 3d 997) or the porch (*People v. Wiley* (1988), 169 Ill. App. 3d 140) of a house constitutes the unlawful entry of a residence.

## Evidentiary Rulings

Defendant next challenges several evidentiary rulings as denying him a fair trial and due process. Defendant first challenges the admission of certain testimony regarding the aggravated arson charge. Count IX of defendant's indictment alleged as follows:

> "Walter Thomas committed the offense of [aggravated arson] in that he, by means of fire, knowingly partially damaged a building of Sophie Dudek, to wit: a garage, located at 302 Windstream, Aurora, DuPage County, Illinois, knowing that Sophie Dudek was present therein, in violation of Illinois Revised Statutes 1985, Chapter 38, Section 20—1.1 ***."

The aggravated arson statute states as follows:

> "A person commits aggravated arson when in the course of committing arson he knowingly damages, partially or totally, any building or structure, including any adjacent building or structure, and (1) he knows or reasona-

bly should know that one or more persons are present therein or (2) any person suffers great bodily harm, or permanent disability or disfigurement as a result of the fire or explosion or (3) a fireman or policeman who is present at the scene acting in the line of duty, is injured as a result of the fire or explosion." (Ill. Rev. Stat. 1985, ch. 38, par. 20—1.1.)

We note that the constitutional infirmities with this statute that this court found in *People v. Johnson* (1986), 114 Ill. 2d 69, have since been eliminated.

Defendant specifically challenges in this argument the admission of testimony indicating the presence of the Smialeks, an elderly couple, who occupied a unit within the structure that defendant set on fire. Defendant contends that this testimony was irrelevant because he was charged only with committing arson while knowing that Sophie Dudek was present, and that the trial judge should have sustained objections to this testimony. Defendant also alleges, in a portion of his fifth argument, that statements that the prosecutor made concerning the presence of the Smialeks were improper. In his sixth argument in this appeal defendant challenges his aggravated arson conviction itself because, he contends, the aggravated arson indictment alleged that he committed arson knowing that Sophie Dudek was present, but the evidence shows that Ms. Dudek was not present because she was dead at the time defendant started the fire. We find no merit in any of these challenges.

Defendant's indictment generally accused him of violating the aggravated arson statute. This statute escalates the punishment for arson when the defendant knowingly damages a structure and one of three states of mind exists or events occur: (1) defendant knew or should have known one or more persons were present; (2) any person was severely injured as a result of the

fire; or (3) a firefighter or police officer was injured responding to the incident.

Section 111—3 of the Code of Criminal Procedure of 1963 states that a charging instrument must set forth "the nature and elements of the offense charged." (Ill. Rev. Stat. 1985, ch. 38, par. 111—3(a)(3).) In *People v. Wisslead* (1985), 108 Ill. 2d 389, 394, we stated that, in certain instances, the statute alleged to have been violated can itself adequately inform the defendant of the nature and elements of the offense charged. However, a variance between the facts alleged and the proof is not fatal if the facts in question are not essential elements of the offense charged. The aggravating factor set out in the statute and relied on in this case is that the act was committed when the defendant "[knew] or reasonably should [have known] that one or more persons [were] present therein." The fact that the indictment alleged that defendant knew that Sophie Dudek was present therein did not preclude evidence that defendant had the same mental state as to others. The identity of the person known to be in the garage is not a material element of the offense and the allegation may be considered surplusage. *People v. Austin* (1984), 123 Ill. App. 3d 788, 794-95.

The indictment specifically stated that defendant knew that Sophie Dudek was present when he set fire to the garage. Beyond that, it was unnecessary for the State to allege anything more than that which the statute already states. It would simply have been redundant for the State to allege defendant should have known that others were present when this is in fact the precise language of the statute itself under which defendant was charged.

The inclusion of Sophie Dudek's name related to the State's allegation that defendant knew someone was present. The State was not required, however, to spell

out the fact that it was alleging that defendant should have known that others were present. As noted above, that language is included in the statute under which defendant was charged. The State acted properly in presenting, and the court acted properly in admitting, evidence that defendant should have known that others were present when he set fire to the structure. The fact that the Smialeks were present when defendant started the fire, in addition to the fact that defendant had been to the building before and knew that it was home to several people, was relevant to the question of whether defendant should have known that others were present at the time he started the fire. Defendant was adequately informed of the crime with which he was charged, and the evidence to which defendant objected was properly admitted as being relevant to the aggravated arson charge. See *People v. Figgers* (1962), 23 Ill. 2d 516, 519; *People v. Givens* (1985), 135 Ill. App. 3d 810, 817.

The second asserted evidentiary error involves several alleged hearsay statements. Defendant first challenges the testimony of Cummins, the polygraph examiner and interrogator, who testified as to several statements that Assistant State's Attorney Robert Spence made to him concerning the details of the crime. Defendant also challenges portions of Spence's testimony in which he restated remarks made in conversations he had with Detective Langston concerning the crime. Finally, defendant challenges portions of Detective Langston's testimony in which he related to the court details of conversations he had with defendant, members of defendant's cleaning crew and defendant's employer, Moore.

Defendant contends that these statements were so irrelevant and inflammatory that they functioned to deny him a fair trial. (*Moore v. Illinois* (1972), 408 U.S. 786, 33 L. Ed. 2d 706, 92 S. Ct. 2562.) Defendant also con-

tends that introduction of this evidence denied him his sixth amendment right to confront witnesses. (*Ohio v. Roberts* (1980), 448 U.S. 56, 65 L. Ed. 2d 597, 100 S. Ct. 2531.) We note first that no objection to these statements appears in the record. As such, even if these statements constitute impermissible hearsay, defendant has waived his claim by failing to file a timely objection. (*People v. Akis* (1976), 63 Ill. 2d 296, 299.) Defendant asserts, however, that this court should notice the alleged errors under the plain error exception to the waiver doctrine. (107 Ill. 2d R. 615 (a).) We will not. The proper standard for applying the plain error doctrine is whether the statements "were so inflammatory that defendant could not have received a fair trial or so flagrant as to threaten deterioration of the judicial process." (*People v. Owens* (1984), 102 Ill. 2d 88, 104.) Even if the challenged statements were impermissible hearsay, they were not flagrant, and any error in admitting the evidence did not operate to deny defendant a fair trial in light of the overwhelming evidence establishing guilt.

## Prosecutorial Statements

Defendant's fifth argument challenges several statements that the prosecutor made during trial as denying him a fair trial and due process. No objections to these statements appear in the record, however. These objections, therefore, are deemed waived. (*People v. Lyles* (1985), 106 Ill. 2d 373, 392.) We will, nevertheless, address these issues to determine whether they amounted to "[p]lain errors or defects affecting substantial rights [that] may be noticed although they were not brought to the attention of the trial court." (107 Ill. 2d R. 615(a).) As stated above the proper standard is whether the statements were so inflammatory or flagrant that defendant could not have received a fair trial or the integrity of the judicial process is jeopardized.

Defendant first challenges the following statement that the prosecutor made during his closing argument:

"As you know from the evidence in this case, November 26, 1986, was the Wednesday before Thanksgiving. Darlene Sophie Dudek was in Indiana on a business trip, due to return home that day to spend Thanksgiving with her family."

Defendant argues that mention of decedent's family was irrelevant and prejudicial because whether decedent had a family is not germane to the question of whether defendant was guilty.

In *People v. Free* (1983), 94 Ill. 2d 378, 415, this court stated as follows: "Common sense tells us that murder victims do not live in a vacuum and that, in most cases, they leave behind family members." We believe that the present case is analogous to *Free*, and distinguishable from *People v. Hope* (1986), 116 Ill. 2d 265, upon which defendant relies and in which the prosecutor commented extensively about the victim's family and in which the trial court allowed the jury to see pictures of the victim's wife and children. The statements in the present case were "incidental and not calculated, and *** were not presented in such a manner as to cause the jury to believe this fact to be material as to the defendant's guilt." (*Free*, 94 Ill. 2d at 415. See also *People v. Jones* (1988), 123 Ill. 2d 387.) The prosecutor in the present case merely commented on the evidence and, in passing, mentioned the decedent's family. The prosecutor did not dwell on this fact or state that it was at all important. As such, these comments were neither flagrant nor inflammatory, and did not serve to deny defendant a fair trial.

Defendant next challenges statements that the prosecutor made concerning the blood found on defendant's clothing. In his opening statement, the prosecutor made the following statement: "So, when Mr. Thomas' vest is

recovered with the same blood type as the victim has ***." In his closing argument, the prosecutor stated, similarly, "the blood that is on [defendant's] vest is consistent with the blood of Darlene Sophie Dudek." In rebuttal, he continued, "[W]ouldn't you know it, ladies and gentlemen, that the vest he has on that day just happens to have type B blood on it?" The prosecutor also commented during rebuttal that the Du Page County crime lab would not lie when stating that the blood found on defendant's vest was the same ABO type as, and enzymatically consistent with, the victim's. The prosecutor concluded, "I think the evidence is clear, it is type B blood ***."

Defendant contends that these statements were improper because there was no evidence that confirmed that the blood found on defendant's vest was type B blood. Defendant points to the following testimony from Christine Sahs, the State's expert witness:

"Q. And you did not state in that report that the extracts of the stains reveals the presence of B Substance?

A. Yes, ma'am.

Q. Your report does not state that the extracts were, in fact, B blood, does it?

A. No, ma'am.

Q. And it is true, is it not, that there are numerous things that also type as B substance?

A. There is a possibility, yes, ma'am.

Q. Well, are there or are there not numerous things which type as B substance?

A. Several things, yes, ma'am.

Q. And one of those things is bacteria?

A. That is correct.

Q. And E. Coli bacteria is an example?

A. Yes.

Q. E. Coli is an extremely prevalent bacteria; is that true?

A. Yes, ma'am.

Q. And the reason why you did not, in fact, state that the stains were B blood is because you can't be positive that they were B blood, can you?

A. That is correct.

Q. In fact, it is possible that they are something other than B blood?

A. Yes, ma'am."

The State, however, points to a different portion of Ms. Sahs' testimony in defense of the challenged comments:

"Q. When you drew this second finding, did you go further to type the blood within the ABO system?

A. Yes, sir.

Q. Did you do all of that for all 7 of the areas that you cut from the vest that you suspected blood stains?

A. Yes, sir.

Q. What was the results of those tests?

A. That all 7 stains came up with the same blood type, a type B.

Q. That is the same blood type as Sophie Darlene Dudek?

A. That's correct."

We are convinced, from reading the record of Sahs' testimony, that the prosecutor's statements were permissible. In *People v. Halteman* (1956), 10 Ill. 2d 74, 83-84, we stated that counsel may properly comment "upon the facts, or upon legitimate inferences deduced therefrom." In the present case, the prosecutor merely commented on the well-informed opinion of a scientific expert.

Defendant asserts that this situation is the same as that in *People v. Giangrande* (1981), 101 Ill. App. 3d 397. In *Giangrande*, the court determined that the prosecutor overstated the evidence by saying in her closing argument that hair found near the decedent's body came from defendant. In fact, the forensic scientist who testified stated nothing more than that the hair could have come from the defendant. In the present case, the prosecutor did not say that the blood found on defendant's

vest was that of Sophie Dudek. The prosecutor merely commented on the opinion that Sahs proffered; that is, that the blood found on defendant's vest was the same ABO type as, and enzymatically consistent with, Sophie Dudek's blood. As such, the prosecutor's statements were not impermissible.

Defendant also claims that the prosecutor erred by commenting on the presence of the Smialeks, the elderly couple that was in the building when defendant set it on fire. As we stated earlier, this evidence was relevant to the question of whether defendant knew or should have known that others were present when he committed arson. As such, we find that these remarks were not improper.

The fourth asserted error with regard to statements that the prosecutor made during the trial involves the following remark:

"What she [Mr. Thomas' attorney] says is not evidence. No one wants you to base your decision on anything but evidence.

Where is the evidence that Walter Thomas made a statement because he was afraid of the death penalty? What witness in this case took that stand and said Walter was afraid of the death penalty and that's why he made the statement?"

Defendant claims that this comment violates the mandate set forth by the Supreme Court in *Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229, that the State may not comment on defendant's refusal to testify.

We find no merit in defendant's argument. In *People v. Dixon* (1982), 91 Ill. 2d 346, 350, we stated that a defendant's right to remain silent is not violated unless a reference to his failure to testify, whether direct or indirect, is intended to direct the jury's attention to the fact that defendant chose not to exercise his right to testify.

The *Dixon* court further stated that, where such a reference is designed to demonstrate a lack of evidentiary basis for a defense counsel argument, rather than to point to defendant's failure to testify, such an argument is permissible. (See also *People v. Lyles* (1985), 106 Ill. 2d 373, 390; *People v. Bryant* (1983), 94 Ill. 2d 514, 524.) In the present case, the prosecutor was responding to an argument that defense counsel made in her closing argument that defendant's confession was induced by showing him a newspaper article concerning a death sentence carried out in Texas. The prosecutor's remarks, therefore, were not improper.

Defendant also challenges prosecution remarks concerning the testimony of Assistant State's Attorney Robert Spence. Spence testified concerning several admissions Thomas made regarding his participation in the crimes. During his closing argument, the prosecutor made the following statement:

"Mr. Spence, who has been an attorney in the State of Illinois for over six years, not only is he an attorney, but he is a sworn Assistant State's Attorney, sworn to uphold the laws of Illinois and the Constitution of the United States.

Is Mr. Spence a liar? I suggest that he is [*sic*], ladies and gentlemen, there certainly isn't one iota of evidence to suggest that Mr. Spence came into this courtroom and risked his law license by lying.

The defendant confessed to Bob Spence."

Defendant cites *People v. Sexton* (1987), 162 Ill. App. 3d 607, in support of his contention that these remarks denied him a fair trial and, therefore, require reversal. In *Sexton*, an assistant State's Attorney testified that he suspected the defendant because all the evidence pointed to his guilt. The assistant State's Attorney also apparently mentioned some evidence that was not admitted at trial. Additionally, the assistant State's Attorney testified that

he ran an honest office, could lose his license if he lied, and that his relationship with the prosecutor in the case would not affect his testimony. The *Sexton* court concluded that, because the case essentially turned upon a jury determination of whether the defendant was more truthful than the complainant and the State's Attorney and his office, placing the credibility of the State's Attorney's office behind the charges constituted plain error.

While we might be persuaded that the prosecutor's comment in his closing argument was improper, we are unable to conclude that it constituted plain error. Even if Spence's testimony was never presented, there was ample evidence establishing that defendant confessed to the crimes charged. Defendant confessed to the crimes in front of Spence, Langston and Detective Davis, and defendant signed a typewritten confession. Defendant, therefore, was not denied a fair trial because of this statement.

Finally, defendant contends, citing *Donnelly v. De Christoforo* (1974), 416 U.S. 637, 40 L. Ed. 2d 431, 94 S. Ct. 1868, that these statements that the prosecutor made "so infected the trial with unfairness as to make the resulting conviction a denial of due process." We conclude, as did the *Donnelly* Court, that the prosecutor's remarks did not operate to deny defendant a fair trial. If any of the statements of which defendant complains amounted to error, that error was inconspicuous and insignificant. The jury was admonished, moreover, that the statements of counsel were not evidence. We conclude, therefore, that the prosecutor's statements, both individually and cumulatively, were not flagrant and did not deny defendant a fair trial.

## Aggravated Arson

Defendant's sixth argument in this appeal relates again to his conviction for aggravated arson. Defendant

contends that the State charged him only with committing arson knowing that Sophie Dudek was present and, because the evidence established that Ms. Dudek was dead at the time defendant started the fire, his conviction cannot stand because the statute only applies when a living person is present.

We note first, as we stated earlier in this opinion, that defendant was charged generally with violating the aggravated arson statute and that this charge properly alleged that he committed arson when he should have known that other people were present. Although defendant has never challenged his indictment, we find that it was not unconstitutionally vague or duplicitous. Defendant was on notice that he was being charged with committing arson while he knew that Sophie Dudek was present or while he should have known that others were present. Defendant never sought a bill of particulars or challenged the substance of his indictment. He was convicted, moreover, on only one count of aggravated arson. See *People v. Rentsch* (1988), 167 Ill. App. 3d 368, 371-73 (indictment that informs defendant of crimes charged and prevents double jeopardy is sufficient).

The evidence in this case established that the Smialeks were, in fact, present when Thomas started the fire. Although itself not dispositive of the question of whether defendant should have known that other people were present, the evidence of the Smialeks' presence was certainly indicative of that conclusion. Other evidence established, moreover, that Thomas had previously worked in the building that he set on fire, and in similar buildings. We conclude, therefore, that defendant was properly charged with committing arson while he should have known that others were present and that the evidence was sufficient to support his conviction for aggravated arson.

We are also unpersuaded by defendant's contention that one cannot commit aggravated arson if the person who the State alleges the defendant knew was present was in fact dead at the time he committed the arson. In support of his argument, defendant cites *People v. Wick* (1985), 107 Ill. 2d 62, 66, in which this court stated the following:

"No doubt the purpose of the portion of the aggravated-arson statute under which the defendant was charged (sec. 20—1.1(a)(3)) was to subject arsonists to a more severe penalty when their conduct results in personal injury to firemen or policemen than when it results in property damage only."

Defendant, in the present case, was charged under a different portion of the statute than was the defendant in *Wick*. Here, defendant was charged with committing arson while he knew that Sophie Dudek was present and while he should have known that others were present. We think it is clear that this portion of the aggravated arson statute is designed to escalate the punishment for arsons committed when the defendant commits arson with the knowledge that someone is likely to get hurt or killed, and the portion of the statute in question in *Wick* was designed to escalate the punishment for arsons that actually cause injury or death.

With regard to the portion of the statute in question here, we think it is immaterial whether Dudek was dead at the time of the arson. As we stated earlier, defendant was properly charged with and convicted of committing arson when he should have known that others were present. Defendant was also properly charged with committing arson knowing that Sophie Dudek was present. Although the evidence at trial established that she was probably dead when the fire was started, there is no indication that defendant knew she was dead when he set fire to the garage. Defendant's guilt of aggravated arson

should not depend upon the happenstance of whether the decedent expired before or after the defendant struck the match. Dudek's death and the arson were both part of a closely related criminal episode. Whether she died shortly before or shortly after the fire was ignited is not material to the fulfillment of the purpose of the statute.

## Murder in the Course of Another Felony

Defendant next challenges the applicability of the death penalty statute to his case. Thomas is eligible for the death penalty because the jury determined both that he committed murder and that the murder occurred in the course of another felony, specifically arson, aggravated arson or burglary. (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(b).) Defendant contends that it was not possible for him to commit murder "in the course of" arson or aggravated arson because Sophie Dudek was dead at the time he started the fire.

We addressed this argument in several other recent cases. (*People v. Flores* (1989), 128 Ill. 2d 66, 97; *People v. Richardson* (1988), 123 Ill. 2d 322, 359; *People v. Walker* (1982), 91 Ill. 2d 502.) In *Richardson,* we stated as follows:

> "Just as the phrase 'in the course of' does not require that defendant complete one of the other felonies in order to be eligible for the death sentence [citation], we also believe that it does not require that the armed robbery commence prior to the fatal gunshot, since the precise timing of the offenses is not necessarily indicative of defendant's intent. The jury concluded beyond a reasonable doubt that defendant committed both a murder and an armed robbery, which offenses occurred essentially simultaneously. The trial testimony and verdicts sufficiently support the court's finding that the murder occurred 'in the course of' an armed robbery." (*Richardson,* 123 Ill. 2d at 359.)

So too, here, defendant committed both murder and arson, and aggravated arson and burglary, and these crimes occurred "essentially simultaneously." It is not imperative that the State prove beyond a reasonable doubt that defendant formed the criminal intent to commit arson or aggravated arson before committing murder. It is sufficient that the State proved the elements of the crimes and the accompanying felonies were part of the same criminal episode. See *Way v. State* (Fla. 1986), 496 So. 2d 126, 128.

Defendant cites two cases from the California Supreme Court in support of his contention that he is not eligible for the death penalty. (*People v. Morris* (1988), 46 Cal. 3d 1, 756 P.2d 843, 249 Cal. Rptr. 119; *People v. Green* (1980), 27 Cal. 3d 1, 609 P.2d 468, 164 Cal. Rptr. 1.) In *Green*, the California Supreme Court determined that its capital punishment statute was inapplicable when the felony which accompanies the murder is "merely incidental to the murder"; for instance, when the sole object is to facilitate or conceal the crime of murder. (*Green*, 27 Cal. 3d at 61, 609 P.2d at 505, 164 Cal. Rptr. at 38.) The California Supreme Court determined that the particular clause of the California death penalty statute that it was construing was designed to punish more severely "those defendants who killed in cold blood in order to advance an independent felonious purpose."

We decline to adopt the reasoning of the California Supreme Court for two reasons. First, the language of the California statute is different from that of the Illinois statute. The California statute permits the imposition of the death penalty when the jury finds that the defendant committed murder "during the commission or attempted commission of" one of several enumerated felonies. (*Green*, 27 Cal. 3d at 59, 609 P.2d at 504, 164 Cal. Rptr. at 37, citing Cal. Penal Code §190.2 (Deering

1985).) We think that this language contemplates a shorter time frame than does the "in the course of" language found in the Illinois statute (Ill. Rev. Stat. 1985, ch. 38, par. 9—1). That is, we think that the Illinois statute recognizes that the crime of murder is not necessarily complete when the victim's heart stops beating, but rather the crime continues throughout the time that the perpetrator conceals the crime and flees the scene. Therefore, the crimes of arson, aggravated arson and murder in this case sufficiently overlapped to support the jury's finding that the murder occurred in the course of the other felonies.

Second, we do not think that the portion of the Illinois death penalty statute under which defendant was found eligible is designed only to apply to murders that "advance an independent felonious purpose." (*Green*, 27 Cal. 3d at 61, 609 P.2d at 505, 164 Cal. Rptr. at 38.) The distinction between murder facilitating arson and arson facilitating murder, which defendant raises, is not determinative. We cannot say, as did the California Supreme Court in interpreting its own statute, that our legislature intended that this portion of the death penalty statute apply only to cases in which the defendant kills in the furtherance of another crime. The language of the Illinois death penalty statute is not that restrictive. It applies with equal force to those situations in which a defendant commits a series of crimes, one of which is murder. The statute imparts no significance to the precise timing of the formation of criminal intent with regard to the various felonies defendant commits. The defendant in this case was on notice that his crimes made him eligible for the death sentence.

As such, we find that a defendant is eligible for the death penalty if he commits murder and one of the specifically enumerated felonies either simultaneously or as part of the same criminal episode. This rule, further-

more, is consistent with Federal constitutional precedent which prohibits arbitrary application of the death penalty. (See *Gregg v. Georgia* (1976), 428 U.S. 153, 49 L. Ed. 2d 859, 96 S. Ct. 2909; *Furman v. Georgia* (1972), 408 U.S. 238, 33 L. Ed. 2d 346, 92 S. Ct. 2726.) The statute is neither vague nor overly broad. In the present case, defendant committed murder, arson, aggravated arson and burglary as part of the same criminal episode. He is accordingly eligible for the death sentence.

## Murder in the Course of Burglary

Defendant's eighth argument states essentially that he is not eligible for the death penalty because he committed residential burglary, rather than burglary, and residential burglary was not, at the time of the incident, one of the enumerated felonies that made one eligible for the death penalty if murder was committed in the course of that felony. Furthermore, defendant contends, because the court did not instruct the jury to specify which felony it found defendant committed along with murder, there is a constitutionally impermissible risk that the jury found him eligible for the death penalty pursuant to a crime which he did not commit. Because we ruled earlier in this opinion that defendant was properly charged with and convicted for burglary, however, we reject this argument.

## Murder in the Course of Aggravated Arson

Similarly, defendant's ninth argument states that he is not eligible for the death penalty because he was not properly convicted of committing aggravated arson, and he did not commit murder in the course of arson or aggravated arson. Therefore, defendant contends, he may have been sentenced to death pursuant to his arson, aggravated arson or burglary conviction, any one or all of which may have been improper. As such, defendant ar-

gues, his death sentence is constitutionally impermissible. As we stated earlier, defendant was properly charged with and convicted for arson, aggravated arson and burglary, and the murder occurred in the course of all these felonies. As such, we cannot disturb defendant's death sentence for this reason.

### Constitutionality; Burden on Defendant

Defendant next makes a series of challenges to the death penalty itself. We hold here, however, as we have in several other cases, that these challenges are without merit.

Defendant first contends that the Illinois death penalty statute unconstitutionally places the burden of persuasion on the defendant. Although defendant does not specifically so state, we assume, via the process of elimination, that this portion of defendant's argument is based on the due process clause of the fourteenth amendment to the Federal Constitution.

The Illinois death penalty statute states, in pertinent part, as follows:

> "If the jury determines unanimously that there are no mitigating factors sufficient to preclude the imposition of the death sentence, the court shall sentence the defendant to death." (Ill. Rev. Stat. 1985, ch. 38, par. 9—1(g).)

Defendant contends that this language unconstitutionally places the burden upon him to prove that death should not be imposed and creates a mandatory rebuttable presumption in favor of the death penalty. (See *Francis v. Franklin* (1985), 471 U.S. 307, 85 L. Ed. 2d 344, 105 S. Ct. 1965.) We have repeatedly stated that no such unconstitutional burden-shifting is encompassed in the statute. *People v. Jones* (1988), 123 Ill. 2d 387, 426-27 ("the statutory scheme does not have the effect of casting on a defendant the burden of establishing mitigating circumstances sufficient to preclude imposition of the death

penalty"), citing *People v. Morgan* (1986), 112 Ill. 2d 111, 147-48; *People v. King* (1986), 109 Ill. 2d 514, 546-47; *People v. Caballero* (1984), 102 Ill. 2d 23, 49. See also *People v. Guest* (1987), 116 Ill. 2d 72; *People v. Johnson* (1986), 114 Ill. 2d 170; *People v. Del Vecchio* (1985), 105 Ill. 2d 414.

Defendant contends, irrespective of the wealth of authority upholding the constitutionality of the Illinois statute, that the Illinois Supreme Court cases present a conflict. In *People v. Olinger* (1986), 112 Ill. 2d 324, 351, we stated that "once the State established the existence of statutory aggravating factors defendant had the burden of coming forward with evidence of mitigating factors." We note, however, that the burden of coming forward with evidence and the burden of proving a fact are entirely different concepts. (See *McKoy v. North Carolina* (1990), 494 U.S. 433, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (White, J., concurring).) It can hardly be termed a burden for defendant to put forth into evidence mitigating factors. These exist in every instance. In fact, the jury is specifically permitted to consider mitigating factors regardless of from what source it finds them. After these mitigating factors are presented, the jury or judge then engages in a process of balancing mitigating and aggravating factors to determine whether the death sentence is appropriate in a particular instance. There is no presumption that the death sentence is appropriate.

We note also that the following statement from *People v. Owens* (1984), 102 Ill. 2d 88, 114, is not inconsistent with the law in Illinois as we have restated it in other cases:

"When there is no mitigating factor for the court to weigh against an aggravating factor that has been found to exist beyond a reasonable doubt, the statute obligates the judge to impose the death sentence, as the sentencing court here observed."

In *Owens*, the State bore its burden of establishing beyond a reasonable doubt the existence of an aggravating factor. The defendant did not put forth any mitigating factors and, because the jury could not find sufficient mitigating factors elsewhere, the defendant was appropriately sentenced to death. Neither *Owens* nor any other Illinois death penalty case has required a defendant to overcome a presumption that the death penalty is proper. The Illinois statute requires only that, where the State presents evidence that the death penalty is appropriate, the defendant must also present evidence that it is inappropriate or otherwise leave himself at the mercy of the jury to find a sufficient reason not to impose the death sentence. After that, the sentencer is charged with making an individualized determination of the propriety of the death sentence in each particular case. This scheme is consistent with existing constitutional precedent. Defendant's argument, therefore, is without merit.

Defendant next argues that, even if the Illinois death penalty statute is not facially unconstitutional, it was made so in this case by the jury instructions and the prosecutor's remarks during the sentencing hearing. Defendant specifically challenges several instructions that informed the jury that the court would sentence defendant to death if the jury found that there were "no mitigating factors sufficient to preclude imposition of a death sentence." (Illinois Pattern Jury Instructions, Criminal, Nos. 7C.04, 7C.06, 7C.08, 7C.09 (2d ed. Supp. 1987).) Defendant also challenges several statements that the prosecutor made in which he reiterated the contents of these instructions.

Defendant makes his first challenge to these instructions and statements in this appeal. Where no objection was made at trial or in a post-trial motion, the challenge

is waived. (*People v. Huckstead* (1982), 91 Ill. 2d 536, 543-44.) His objection, therefore, is waived.

Defendant asserts that we should nevertheless address his challenges because the proffered instructions and the prosecutor's statements amounted to plain error. We decline to do so, however, because we find that the proffered instructions and the comments of the prosecutor did not misstate the law, let alone deny defendant a fair trial.

We are likewise unpersuaded by defendant's argument that this court should address his challenges irrespective of the fact that he failed to object to the instructions or the prosecutor's remarks at trial or in a post-trial motion because the instructions are Illinois pattern instructions. Stating objections to the trial court is not simply a ministerial act. There are at least five significant reasons for stating objections to the trial court, as the appellate court of Illinois has noted:

"(1) [T]o insure that the trial court is informed of possible errors so that the court has an opportunity to correct those errors; (2) to give the reviewing court the benefit of the judgment and observations of the trial court with regard to the issues raised on appeal; (3) to prevent a defendant from objecting to that in which he has acquiesced during the course of trial; (4) to eliminate unnecessary reviews and reversals; and (5) to prevent the possibility of unlimited litigation." (*People v. Lett* (1978), 61 Ill. App. 3d 467, 470-71.)

In light of this statement, with which we concur, we find no merit in defendant's argument that we should review matters, irrespective of the fact that no objection was raised in the trial court, when counsel perceives that such an objection holds little hope for success.

Defendant next argues that the Illinois death penalty statute facially violates the eighth amendment to the United States Constitution because it imparts a presump-

tion that death is the appropriate penalty, which defendant must overcome. Defendant acknowledges that we have repeatedly addressed and rejected this argument, but he argues that a recent Federal court of appeals ruling should persuade us to reconsider. We will not.

In *Adamson v. Ricketts* (9th Cir. 1988), 865 F.2d 1011, 1041-44, the court ruled that the Arizona death penalty statute, which is similar to ours, is unconstitutional because it imparts a presumption of death that abrogates the Supreme Court mandate in *Woodson v. North Carolina* (1976), 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991, that the capital sentencing determination take into account the "character and record of the individual offender and the circumstances of the particular offense."

We note first that we are not bound by constitutional precedent set by a Federal court construing the law of another State. We also remain convinced that the Illinois death penalty statute is constitutionally permissible.

The *Adamson* court found that the language in the Arizona statute, "sufficiently substantial to call for leniency," creates a presumption of death once an aggravating circumstance is found. Defendant contends that the language in the Illinois statute, "sufficient to preclude the imposition of the death sentence," makes our statute unconstitutional as well. We think, however, that the result in *Adamson* turned on the language in the Arizona statute that places the burden on the defendant to establish mitigating circumstances: "The burden of establishing the existence of the circumstances set forth in subsection G [mitigating circumstances] of this section is on the defendant." (Ariz. Rev. Stat. Ann. §13—703 (Supp. 1983-84).) In Illinois, no such burden exists. The Illinois statute specifically confers upon the State the burden of establishing beyond a reasonable doubt the existence of aggravating factors. (Ill. Rev. Stat. 1985, ch.

38, par. 9—1(f).) The jury may consider mitigating factors, however, regardless of from where they are found. The jury is charged with determining whether the mitigating factors which it finds, regardless of where it found them, outweigh the aggravating factor or factors that the State is charged with proving.

The *Adamson* court acknowledged this distinction. (865 F.2d at 1043 n.51 (distinguishing *Campbell v. Kincheloe* (9th Cir. 1987), 829 F.2d 1453).) The *Campbell* court, which was also a panel from the Ninth Circuit, affirmed the constitutionality of the Washington capital punishment statute regardless of the fact that it too requires the court to impose the death sentence if it cannot find "sufficient mitigating circumstances to merit leniency." (829 F.2d at 1466.) In light of this, we are not persuaded that we should abandon a wealth of precedent that establishes that the Illinois death penalty statute does not violate the eighth amendment. We note finally that the United States Supreme Court has apparently put this argument to rest in *Blystone v. Pennsylvania* (1990), 494 U.S. 299, 108 L. Ed. 2d 255, 110 S. Ct. 1078.

Defendant also argues that the Illinois death penalty statute violates the fourteenth amendment to the United States Constitution because it places the burden of persuasion on the defendant to establish sufficient mitigating circumstances to preclude the death sentence. As we stated earlier in this opinion, this court has repeatedly addressed this issue and rejected it. See, *e.g., People v. Jones* (1988), 123 Ill. 2d 387.

### Prosecutorial Remarks at Sentencing Hearing

Defendant next argues that several statements that the prosecutor made during the second stage of the sentencing hearing entitle defendant to a new sentencing hearing. We cannot agree.

Defendant's first challenge relates to the following remark that the prosecutor made during his opening statement of the second phase of the sentencing hearing:

> "And Detective Langston, one of the things that he will tell you, he questioned Walter Thomas as regarding the prior sexual offenses and he told Walter Thomas, one or both of these cases with young women, just like Nancy Tarnowski and both of those cases young white women and both of those cases involved knives."

Defendant contends that the prosecutor's reference to the victims' race was impermissible. While we agree that this statement was improper in this case, we cannot say that it functioned to deny defendant a fair sentencing hearing.

We must note first that no objection to this remark appears in the record. As such, defendant has waived any challenge for the purpose of this appeal. We also must decline to notice this challenge under the plain error doctrine. While we agree that this remark was improper, it had no effect on defendant's substantial rights.

We addressed a similar prosecutorial reference to race in *People v. Johnson* (1986), 114 Ill. 2d 170, 199. We found there, as we find here, that the statement was "unnecessary and potentially offensive," but it was not "intended to incite racial prejudice," nor did it have that effect. There are several reasons why we find this remark to have had no effect on the jury's determination. First, it was an isolated statement. The prosecutor did not dwell on the victims' race. Second, the jury could plainly see that one of the victims that the prosecutor referred to is white because she testified, and it could plainly see that defendant is black because he was in the courtroom. Third, the jury was instructed to consider only the evidence, not the attorneys' remarks. It was also instructed that it could not be influenced by race. We cannot, therefore, say that there is a likelihood that

the result would have been different had the prosecutor not made the statement. As such, we decline to disturb the sentence because of the prosecutor's unfortunate remark.

Defendant also challenges a statement that the prosecutor made during his closing argument of the sentencing hearing:

> "As his honor will tell you, sympathy, passion, prejudice, public opinion, public feeling should not sway you and have no bearing upon your decision in this case."

There is also no objection to this statement in the record. As such, this too has been waived for the purpose of this appeal. We likewise decline to notice this challenge under plain error doctrine.

While we agree, seen only in this context, the prosecutor's remark was not a full and correct statement of the law, the jury was properly instructed by the court that it should "not be swayed by *mere* sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling." (Emphasis added.) It was also instructed that the remarks of the attorneys were not evidence. As such, we will not disturb defendant's sentence for this reason either.

Defendant next contends that several other remarks that the prosecutor made misstated the law and functioned to deny defendant a fair sentencing hearing. Defendant challenges the following remarks:

> "Under the law, as his honor will tell you and based upon the facts that you have already heard, the defendant must be sentenced to death, unless you find that there is some mitigating factor to preclude you from following the law and from imposing the sentence of death. Not just some mitigation. Not just that defendant had done some odd jobs or fixed up church steps or videotaped some church proceedings. Not just some mitigation, ladies and gentlemen, but sufficient to preclude you, under the law, from following your obligation as jurors."

"Some of the things I would like you to remember, ladies and gentlemen, when you are considering whether or not there is sufficient mitigation to preclude you from following the law in this case, and that is, to impose the death penalty, consider LeMay Russell, who testified, doesn't really know the defendant. She knows that he doesn't rape his neighbors or burglarize his neighbors, but that's about it."

"He is 31 years old. What does that tell you about this defendant? The defendant took the life of Darlene Dudek. He hoped that he would completely destroy that structure so his crimes could be hidden forever, but it wasn't, ladies and gentlemen, and today is a day of reckoning for Walter Thomas. Today is the day for you to impose what the law requires. Return a verdict requiring his honor, Judge Kowal, to impose the sentence of death."

We note first that no objection to these remarks appears in the record. As such, defendant has waived his challenge for the purpose of this appeal. We also decline to find that these statements amounted to plain error.

In the context in which they appear, these remarks might have misinformed the jury of their proper role. We find no likelihood, however, that the jury was misled by these statements. A review of the record indicates that the entire context of the sentencing hearing provided the jury with a sufficient understanding of its duty. The mere fact that the prosecutor was overzealous does not provide this court with the opportunity to disturb defendant's sentence, unless those statements operated to deny defendant a fair sentencing hearing. We cannot find such a denial in this case. *People v. Carlson* (1980), 79 Ill. 2d 564.

## Victim Impact Remark

Defendant's twelfth argument is that he was denied a fair sentencing hearing because the prosecution improperly injected evidence, and improperly made comments,

concerning the families of his victims. Defendant specifically objects to the testimony of Dudek's neighbor, and several statements to the same effect by the prosecutor, who stated, at trial, that Dudek planned to spend Thanksgiving with her family. Defendant also objects to the testimony of Nancy Tarnowski, one of defendant's former victims, who stated that she and her family moved away as a result of the sexual assault that defendant committed.

Defendant contends that these various statements pertaining to the victims' families caused the jury to improperly focus its attention on something other than the defendant himself. Defendant contends that recent Supreme Court precedent requires that he be granted a new sentencing hearing. (See *South Carolina v. Gathers* (1989), 490 U.S. 805, 104 L. Ed. 2d 876, 109 S. Ct. 2207; *Booth v. Maryland* (1987), 482 U.S. 496, 96 L. Ed. 2d 440, 107 S. Ct. 2529.) We are not persuaded by defendant's argument that the Constitution, as the Supreme Court has interpreted it, requires that defendant be granted a new sentencing hearing in the present case.

In *Booth*, the Supreme Court ruled that victim impact statements are not admissible at a capital sentencing hearing because they act to shift the focus from the defendant, and whether he is particularly suited for the death penalty, to the victim. In *Gathers*, the Court expanded this rule to include statements that the prosecutor makes which have the same effect of shifting the jury's focus. In the present case, the prosecutor's statement concerning the victims' families, and the trial evidence that alluded to this, were isolated and inconspicuous. In *Booth*, the entire victim impact statement was read to the jury. In *Gathers*, the prosecutor made an extensive dissertation on how the victim was a religious man and how he practiced his religion. In the present case, however, we find no likelihood that the jury's focus

was shifted from anything but those factors of which defendant was aware when he committed the crimes with which he was charged. As such, we will not disturb his death sentence. *Cf. People v. Harris* (1989), 132 Ill. 2d 366, 395-98 (entire victim impact statement made part of the record); *People v. Phillips* (1989), 127 Ill. 2d 499, 535-38; *People v. Crews* (1988), 122 Ill. 2d 266, 286-88 (diminished risk of focus-shifting when sentencing hearing is held before a judge alone); *People v. Simms* (1988), 121 Ill. 2d 259, 271-76 (several victim impact statements considered by the sentencing judge were not harmless beyond a reasonable doubt).

## Unadjudicated Criminal Conduct

Defendant next challenges the decision of the trial court to admit evidence during the sentencing hearing of unadjudicated criminal conduct. That evidence involved the testimony of Ken Bertrand, who stated that he had discovered Thomas in his garage on one occasion. Bertrand testified that he kept valuable tools in his garage and that defendant had no permission to be there.

This court addressed this same issue in *People v. Ramirez* (1983), 98 Ill. 2d 439, 460-61. We found in *Ramirez*, and we find here, that evidence of prior criminal conduct is admissible at a sentencing hearing, even though it was not adjudicated, if it is relevant, reliable and subject to cross-examination. The purpose of the sentencing hearing is to examine the defendant's character and to decide what punishment is appropriate. (*Woodson v. North Carolina* (1976), 428 U.S. 280, 49 L. Ed. 2d 944, 96 S. Ct. 2978.) Such a determination requires an inquiry into defendant's propensity to commit another crime. Defendant's criminal history, whether adjudicated or not, is relevant to that determination and should be admitted so long as it is reliable. This determination of relevance and reliability is properly made by

the trial court, and this court will not disturb the trial court's judgment unless it demonstrates an abuse of discretion. No such abuse occurred in the present case. See also *People v. La Pointe* (1981), 88 Ill. 2d 482.

## Venire Member Questioning; Parole Law

Defendant's fourteenth argument in this appeal states that the trial court violated his eighth and fourteenth amendment rights by not allowing questioning of prospective jurors during *voir dire* concerning any preconceived notions they might have regarding Illinois parole law. Defendant sought this inquiry to determine if potential jury members had fears that if the defendant was not executed he would soon be released from prison. Defendant argues that a requirement of such *voir dire* questioning follows logically from *People v. Gacho* (1988), 122 Ill. 2d 221, which held that the jury must be instructed following a sentencing hearing that life imprisonment without the possibility of parole is the only alternative to the death sentence. We decline to extend the ruling in *Gacho* this far.

The court refused to pose these questions to the prospective jurors in the present case because it found that such an inquiry was not relevant to their capacity to serve as jurors, and that the jurors might become confused by such questioning. The scope of permissible questioning during *voir dire* is properly determined by the sound discretion of the trial court. (*People v. Morgan* (1986), 112 Ill. 2d 111, 129.) We cannot find here that the trial court abused its discretion. The questioning that defense counsel sought to pose to the potential jurors would provide little help in deciding how to exercise defendant's peremptory challenges, but had a potential to confuse the members of the panel. We note that a Federal court of appeals that addressed this same argument termed it "technical to the point of absurdity."

(*King v. Lynaugh* (5th Cir. 1988), 850 F.2d 1055, 1058.) We are similarly unimpressed.

## Due Process

Defendant next argues once again that the Illinois death penalty statute violates due process because it does not require that the State prove beyond a reasonable doubt that there are no sufficient mitigating factors to preclude imposition of the death sentence. We rejected this argument earlier in this opinion, and we have repeatedly rejected this argument in other cases. (*People v. Fields* (1990), 135 Ill. 2d 19, 51; *People v. Erickson* (1987), 117 Ill. 2d 271.) Defendant does not provide a sufficient reason for this court to reconsider those decisions here.

## Cumulative Unconstitutionality

Defendant's final argument is that several provisions of the Illinois death penalty statute, although each itself has been found to be constitutional by this court, collectively function to make the Illinois capital sentencing process unconstitutionally arbitrary and capricious. Defendant challenges the cumulative effect of the following components of the Illinois capital sentencing scheme: (1) prosecutorial discretion; (2) absence of required pretrial notice; (3) limited comparative proportionality review; (4) absence of required written findings by sentencer; (5) absence of requirement that all aggravating evidence be made known to defendant before trial; (6) prosecution's burden of proof; and (7) preclusion of sentencer's consideration of exact range of applicable sentences other than death.

In *People v. Phillips* (1989), 127 Ill. 2d 499, 542-43, this court rejected this argument, and recapped the various precedent rejecting the individual arguments, stating "[i]f all of the individual aspects are constitutional, we

stand by the conclusion that the whole is also constitutional." Defendant states nothing new here to persuade us to reconsider.

## Conclusion

For the reasons stated, this court affirms defendant's convictions and sentences for murder, arson, aggravated arson and burglary. The clerk of this court is directed to enter an order setting Tuesday, November 20, 1990, as the date on which the death sentence, entered in the circuit court of Du Page County, is to be carried out. Defendant shall be executed by lethal injection in the manner provided by section 119—5 of the Code of Criminal Procedure of 1963 (Ill. Rev. Stat. 1985, ch. 38, par. 119—5). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, the warden at Stateville Correctional Center, and the warden of the institution in which defendant is confined.

*Judgment affirmed.*

JUSTICE CLARK, concurring in part and dissenting in part:

I concur in the majority's decision to uphold the defendant's convictions. However, I believe that the prosecutor's injection of racial issues into the second stage of the sentencing hearing deprived the defendant of a fair sentencing hearing. The unfairness of the sentencing hearing was further exacerbated by the prosecutor's improper references to the victim's family, and by the prosecutor's misstatements of law. I therefore would vacate the death sentence and remand to the trial court for a new sentencing hearing.

The prosecutor told the jury during his opening argument at the second phase of the sentencing hearing:

"And Detective Langston, one of the things that he will tell you, he questioned Walter Thomas as regarding the prior sexual offenses and he told Walter Thomas, one or both of these cases with young women, [sic] just like Nancy Tarnowski and both of those cases young white women [sic] and both of those cases involved knives."

The statement apparently refers to the defendant's alleged attack on Nancy Tarnowski and the defendant's convictions for rape and attempted rape, and suggests that the defendant had a history of attacking white women prior to the murder of the white woman in this case.

The United States Supreme Court has recognized that " '[i]t remains an unfortunate fact in our society that violent crimes perpetrated against members of other racial or ethnic groups often raise [a reasonable possibility that racial prejudice would influence the jury].' " (*Turner v. Murray* (1986), 476 U.S. 28, 35 n.7, 90 L. Ed. 2d 27, 36 n.7, 106 S. Ct. 1683, 1688 n.7, quoting *Rosales-Lopez v. United States* (1981), 451 U.S. 182, 192, 68 L. Ed. 2d 22, 31, 101 S. Ct. 1629, 1636.) The possibility that racial prejudice will infect jury deliberations is especially great in the context of capital sentencing proceedings because a jury at such proceedings must "make a 'highly subjective, unique, individualized judgment regarding the punishment that a particular person deserves.' " (*Turner*, 476 U.S. at 34-35, 90 L. Ed. 2d at 35, 106 S. Ct. at 1687, quoting *Caldwell v. Mississippi* (1985), 472 U.S. 320, 340 n.7, 86 L. Ed. 2d 231, 246 n.7, 105 S. Ct. 2633, 2645 n.7.) In a case where racial issues may be involved, a juror possessing overt racist attitudes may place special emphasis on potential aggravating factors, or may give little credence to mitigating factors, due to his racist beliefs. (*Turner*, 476 U.S. at 35, 90 L. Ed. 2d at 35, 106 S. Ct. at 1687.) Even where jurors are not overtly racist, "[m]ore subtle, less consciously held

racial attitudes could also influence a juror's decision
***. Fear of blacks, which could easily be stirred up by
[violent interracial crimes], might incline a juror to favor
the death penalty." (*Turner*, 476 U.S. at 35, 90 L. Ed.
2d at 35-36, 106 S. Ct. at 1688; see also *McFarland·v.
Smith* (1979), 611 F.2d 414, 417 ("To raise the issue of
race is to draw the jury's attention to a characteristic
that the Constitution generally commands us to ignore.
Even a reference that is not derogatory may carry im-
permissible connotations, or may trigger prejudiced re-
sponses in the listeners that the speaker might neither
have predicted nor intended").) The risk that sentencing
may have been based upon racial considerations is "espe-
cially serious [in capital sentencing proceedings] in light
of the complete finality of the death sentence." *Turner*,
476 U.S. at 35, 90 L. Ed. 2d at 35, 106 S. Ct. at 1688.

In recognition of the dangers that can arise when rac-
ism is injected into criminal trials, a number of courts
have held that prosecutorial references to race during
trial constitute reversible error. (See, *e.g.*, *McFarland*,
611 F.2d at 419-20; *Weddington v. State* (Del. 1988), 545
A.2d 607, 614-15.) Courts have similarly held that where
such racial references are made during a sentencing
hearing, the sentence must be vacated. See, *e.g.*, *Daw-
son v. State* (Nev. 1987), 734 P.2d 221, 223-24; *Robinson
v. State* (Fla. 1988), 520 So. 2d 1, 8.

The majority concedes that the prosecutor's remark
was "improper." (137 Ill. 2d at 543.) However, the ma-
jority does not vacate defendant's death sentence be-
cause the majority, with remarkable clairvoyance, finds
"this remark to have had no effect on the jury's determi-
nation." (137 Ill. 2d at 543.) The majority gives three
reasons for this finding: (1) the statement was "iso-
lated"; (2) "the jury could plainly see that one of the vic-
tims that the prosecutor referred to is white because she
testified"; and (3) "the jury was instructed to consider

only the evidence, not the attorneys' remarks. It was also instructed that it could not be influenced by race." (137 Ill. 2d at 543.) I am not persuaded by the majority's rationale.

As the United States Supreme Court and other courts have recognized, the role played by racism in criminal trials is particularly pernicious because racism frequently operates in a subtle manner and on a subconscious level. (See *Turner*, 476 U.S. at 35, 90 L. Ed. 2d at 35-36, 106 S. Ct. at 1688; *McFarland*, 611 F.2d at 417.) Thus, once racial issues are raised, even in an isolated manner, it may be impossible for a juror to set aside his subconscious racial attitudes in making a determination, even if the juror is instructed that he must do so. Furthermore, it is irrelevant that "the jury could plainly see that one of the victims that the prosecutor referred to is white." The jurors could not tell (and I note that nothing in the record on appeal indicates) whether the other two victims mentioned by the prosecutor were white, because they did not testify. Instead, the prosecutor used certified copies of defendant's prior convictions to establish that the defendant had committed crimes against those victims. More important, however, is that even if those victims had testified (and it turned out that they were in fact white), the possibility that racism would have entered into the jury's deliberations would have been greatly minimized had the prosecutor not explicitly informed the jury that the defendant had a history of attacking "young white women."

The majority also cites *People v. Johnson* (1986), 114 Ill. 2d 170, in support of its conclusion that the prosecutor's reference to race did not prejudice the defendant. *Johnson* is distinguishable from the instant case in two respects. The first distinction is that, unlike this case, the defendant in *Johnson* did "not contend that the remark was intended to incite racial prejudice among the

all-white jury or that it had that effect." (*Johnson*, 114 Ill. 2d at 199.) Because this issue was never raised, this court did not consider whether the defendant in *Johnson* was prejudiced by the prosecutor's reference to race. (*Johnson*, 114 Ill. 2d at 199.) Thus, contrary to the majority's assertion, this court did *not* find that the comment in *Johnson* "was not 'intended to incite racial prejudice.' " 137 Ill. 2d at 543.

The second distinction between this case and *Johnson* is that *Johnson* involved a racial comment which was made during the guilt phase of the trial, not during the sentencing hearing. (*Johnson*, 114 Ill. 2d at 198-99.) As such, the possibility that racism affected the jury's verdict in *Johnson* was far less than the possibility that racism affected the jury's decision to impose the death sentence in the instant case. See *Turner*, 476 U.S. at 38 n.12, 90 L. Ed. 2d at 37 n.12, 106 S. Ct. at 1689 n.12 ("the risk of racial bias at sentencing hearings is of an entirely different order [than at the guilt phase of the trial], because the decisions that sentencing jurors must make involve far more subjective judgments than when they are deciding guilt or innocence"); *Dawson*, 734 P.2d at 224 ("Because of the delicate task which the trier of fact has in weighing the mitigating circumstances against the aggravating circumstances, the kind and level of prejudice which might not require reversal of a conviction may be sufficient to require reversal of a death penalty").

I note that, although there was no record made in the trial court as to the races of the jurors, it appears that at least 8 of the 12 jurors were not black. Prior to trial, defense counsel had expressed fear that the fact that the defendant is black and the victim was white would influence the jury. Defense counsel was therefore allowed to question the venirepersons about their racial attitudes. Accordingly, defense counsel asked many of the venire-

persons if they had ever had "any bad experiences with blacks in the past." Of the 12 people selected for the jury, 8 were asked about their experiences with blacks, while 4 were not. It is logical to assume that the reason defense counsel did not question certain venirepersons about their experiences with blacks is that those venirepersons were black. Conversely, defense counsel probably only asked nonblacks about their experiences with blacks.

Because the defendant's life hinged upon the subjective judgments of these jurors, I would hold that the prosecutor's explicit suggestion that the defendant had a history of attacking "young white women," a history which culminated in the killing in this case, was error of such magnitude that the defendant was denied a fair sentencing hearing. Accordingly, I would hold that the prosecutor's statement constituted plain error (see *People v. Carlson* (1980), 79 Ill. 2d 564, 576-77), and I would vacate the defendant's death sentence.

Even if the prosecutor's injection of inflammatory racial issues into the sentencing hearing did not, in itself, constitute reversible error, I would still hold that the cumulative effect of that and other prosecutorial errors deprived the defendant of a fair sentencing hearing. As the majority readily concedes, the prosecutor *twice* misstated the law regarding the jury's duty to weigh mitigating factors. (See 137 Ill. 2d at 544-45.) While I agree that, unlike the injection of irrelevant racial issues into the sentencing hearing, the misstatements of law did not in and of themselves constitute reversible error, I believe that they did contribute to depriving the defendant of a fair sentencing hearing.

In addition to the misstatements of law, the defendant was also unfairly prejudiced by the prosecutor's repeated references to the families of the victims of the crimes at issue during the sentencing hearing. It is well

established that prosecutorial references to a victim's family are improper during both the guilt stage of a trial and the sentencing hearing. (See *People v. Hope* (1986), 116 Ill. 2d 265, 275 (and cases cited therein).) The sole exception to this rule is that such references are admissible if relevant to the circumstances of the crime. See *People v. Simms* (1988), 121 Ill. 2d 259, 268.

The prosecutor in this case repeatedly violated this rule in his closing and rebuttal arguments at the second stage of the sentencing hearing. During his closing argument, the prosecutor explained that the murder occurred on the night before Thanksgiving and that the victim was planning on going "home to spend the holidays with her loved ones." In response to the mitigating evidence introduced by the defendant through testimony from his family members, the prosecutor argued that "Darlene Dudek, ladies and gentlemen, had a family too." The prosecutor also stated that the only time the defendant cried in this case was when he "found out that he wouldn't be home for Christmas, and that's it. *** Well, Darlene Dudek will never be home for Christmas again, and a lot of people's Christmases have been ruined because of this guy." Finally, the prosecutor, referring to the decedent in this case and the victims of the other crimes which were introduced as aggravating factors during the second phase of the sentencing hearing, stated: "The victims in this case are real people. All six of them. They are real people with feelings, with lives, with families, with people who care about them."

The majority does not conclude (and the State does not argue) that the prosecutor's comments were relevant to the circumstances of the crime, or were not improper. Instead, the majority concludes that, unlike cases in which references to victims' families were held to constitute reversible error, the comments here "were isolated and inconspicuous." (137 Ill. 2d at 546.) While I agree that the

repeated references to victims' families in this case were not as extensive or prejudicial as the references in cases such as *People v. Harris* (1989), 132 Ill. 2d 366, 395-98, and *People v. Simms* (1988), 121 Ill. 2d 259, 271, and do not rise to the level of reversible error, I do not agree that the references were "isolated and inconspicuous."

This court has frequently reversed convictions and sentences where there were numerous errors which cumulatively, but not individually, served to deprive the defendant of due process. (See, *e.g.*, *People v. Walker* (1982), 91 Ill. 2d 502, 516-17; *People v. Whitlow* (1982), 89 Ill. 2d 322, 341-42; *People v. Romero* (1967), 36 Ill. 2d 315, 319-20; *People v. Tilley* (1950), 406 Ill. 398, 414.) In some of those cases, many of the errors complained of were not objected to at trial. (See *Whitlow*, 89 Ill. 2d at 341-42; *Romero*, 36 Ill. 2d at 320.) Consideration of the cumulative effect of repeated prosecutorial error is particularly appropriate in reviewing capital sentencing proceedings because the determinations made in such proceedings are based to such a large extent upon subjective considerations.

Because I believe that the defendant was deprived of a fair sentencing hearing, I would vacate defendant's death sentence and remand to the trial court for resentencing.