HENRY DANIEL DAWSON, JR., Appellant, *v.* THE STATE OF NEVADA, Respondent.

No. 17045

March 24, 1987                    734 P.2d 221

*Lynn R. Shoen,* Las Vegas, for Appellant.

*Brian McKay,* Attorney General, Carson City; *Rex Bell,* District Attorney, *James Tufteland,* Deputy District Attorney, Clark County, for Respondent.

## OPINION

*Per Curiam:*

Dawson stands convicted of first degree murder and is under

sentence of death. The conviction is sustained, but the case is returned to the trial court for resentencing.

Dawson's primary claims of error relate to the penalty phase of these proceedings.[1]

Dawson's conviction of first degree murder stems from a brutal kidnapping, beating and rape of a Las Vegas woman. Dawson is black; the victim was white.

The aggravating circumstances upon which the death penalty is based are kidnapping and attempted sexual assault. Dawson claims that there was insufficient evidence before the jury at the penalty hearing to support a finding beyond a reasonable doubt of the commission of these crimes.

That Dawson kidnapped the victim is supported by the evidence. Although the victim may have entered Dawson's vehicle voluntarily, it is improbable under the circumstances that this victim, described as a "very reliable employee," would have voluntarily left unattended her work station at a gas station. The kidnap is further supported by Dawson's admission that he forced the victim to remain in his car by use of a "sticker" being held against her body.

That Dawson at least attempted to assault the victim sexually is also supported by the evidence. Even though no physical evidence of rape was discovered, the victim's body was found nude from the shoulders down.

The jury was justified, from the evidence in this case, in finding beyond a reasonable doubt that Dawson kidnapped the victim and attempted sexual assault, indicating that there was some kind of sexual insult inflicted on the victim by Dawson.

Dawson claims that his death sentence should be vacated by reason of prejudicial statements made by the prosecutor during closing argument at the penalty hearing. First, Dawson complains of the prosecutor's aside to Dawson during argument, "Bye-bye," which Dawson takes to mean the prosecutor's implication that in his opinion Dawson deserved the death penalty. The entire objectionable but unobjected-to remark is set out in the margin.[2]

---

[1]Dawson did attack his conviction on the ground that statements which he made during his initial interview with police detectives should have been excluded from the trial. He claims he was interrogated under custodial detention, while not having been advised of his Miranda rights. We disagree because Dawson was not "in custody" at the time of any supposed interrogation.

[2]During the prosecutor's closing argument at the penalty hearing, the prosecutor stated:

For the prosecutor to bid adieu to the defendant is more of a prediction than an expression of opinion. We have condemned the prosecutor's expression of opinion as to guilt or to deserved penalty because such an opinion unfairly invites undue reliance on conclusions personally endorsed by the prosecuting attorney as representative of the power and dignity of the state. Collier v. State, 101 Nev. 413, 705 P.2d 1126 (1985). In *Collier,* we condemned the prosecutor's melodramatic apostrophe: "Gregory Alan Collier, you deserve to die."

The prosecutor's farewell in the case before us falls short of being an expression of an opinion on whether Dawson deserved the death penalty or not. Defense counsel did not object.

If prosecuting counsel's statement, "bye-bye," to a defendant who himself has used the expression in the course of the criminal investigation is inappropriately facetious, it does not rise to such a level of prejudice to the defendant as to move this court to set aside, on this ground, the jury determination that the death penalty should be imposed.

Similarly, the prosecutor's words, "I say let the light go out on Henry Dawson," is merely an invocation to the jury asking that it impose the death penalty, in the same manner that defense counsel was beseeching the jury to spare his client.[3]

Although the prosecutor did announce in his aside to the defendant that he had an opinion about the defendant and the crime, he did not, as we see it, directly or indirectly, express to the jury that in his opinion, as a state official, Dawson deserved the death penalty.

The prosecutor did, however, approach one subject in his argument to the jury that resulted in unacceptable prejudice to

---

But the light of Leslie Shepard was shattered by the cold callous brutality of Henry Dawson. And like the shattered lamp her light went out behind Caesar's Palace on March 7, 1985. And I say let the light go out of Henry Dawson.

Mr. Dawson, I have been waiting throughout this trial to say this, and I know it's tempting with all the tears on your behalf, it would still to me seem strangely one-sided. It's tempting to pass it by, but I still have my opinion about you and this crime.

When Mr. Dawson was first interviewed on March 7, 1985 at his apartment, he cooperated up to a point. He signed a consent to search but then the questions became too probative. They were too frank. It was too much of a third degree. And then he became uncooperative, and, according to Detective Leavitt, he said bye-bye.

Ever since I viewed the pictures of his victim, and I've contemplated the brutality of this murder, I have waited for this moment. Mr. Dawson, bye-bye.

[3]Defense counsel's words were: "Please spare Henry's life."

Dawson in a death penalty hearing. Although the prosecutor's comment had evidentiary support from testimony admitted during the guilt phase of Dawson's trial, its reiteration during the penalty phase of the trial unduly implicated consideration of race. The prosecutor reminded the jury that Dawson had "a preference for white women" and, further, that Dawson had had a "physical relationship" with a white woman.

We find great difficulty in discerning any legitimate purpose for discussing such matters in a proceeding designed to determine only the extent of punishment to be imposed on Dawson. One must ask the ugly question: Does a black man's supposed sexual preference have anything at all to do with whether he deserves to die for his deeds? Counsel for the state was asked during oral argument of this appeal why Dawson's claimed penchant for white women made him any "more culpable and more deserving of death?" Counsel's answer was: "It doesn't. It doesn't." Counsel argued still that the racial allusions were justified as being "collateral to the defendant's statements regarding getting a girl 'in his pocket.' He happened to say a white girl."

The state's position seems to be that it was proper to comment on this volatile subject because, as counsel argued, it would "cause the jury to reflect on the mental state of the defendant when he committed the crime;" or, putting it another way, "to show that the defendant did not act spontaneously—that he acted through a preconceived plan."

It is a bit difficult to thread through counsel's argument. The gist of the argument seems to be that no racially derived prejudice was intended or resulted; that the defendant's claimed disposition toward white women legitimately tended to show in some manner that Dawson conceived of a plan to capture, rape and murder a white victim; and, apparently, that the presence of such a plan was related to the issue of whether Dawson should live or die.

Rather than try to parse the niceties of appellate counsel's attempt to justify the actions of the state's trial counsel in using this kind of material in a death penalty hearing, we unhesitantly declare such conduct to be prejudicially improper even if there were some logic to it and even if, as claimed, no racial bias was intended to be elicited by the remarks.

In a capital sentencing proceeding before a jury, the jury is called upon to make a "highly subjective, 'unique, individualized judgment regarding the punishment that a particular person deserves.' " Turner v. Murray, ...... U.S. ......, 106 S.Ct. 1683, 1687 (1986); Caldwell v. Mississippi, 472 U.S. 320, 340 n. 7 (1985) (quoting Zant v. Stephens, 462 U.S. 862, 900 (1983) (Rehnquist, J., concurring)). Under the Nevada statute, the jury or three-judge panel weighs the mitigating circumstances to arrive at a final decision as to whether the defendant shall live or

die. It follows, therefore, that a prosecutor must be alert to avoid reintroducing evidence from the guilt phase in the penalty phase if such evidence interjects racial overtones tending to influence unfairly the trier-of-fact's perception of the defendant.

Because of the range of discretion entrusted to a jury in a capital sentencing hearing there is a unique opportunity for racial prejudice to operate but to remain undetected. *Id. Turner* distinguishes between the prejudicial impact of racial sentiments on a jury at the guilt phase and at the penalty phase. Because of the delicate task which the trier of fact has in weighing the mitigating circumstances against the aggravating circumstances, the kind and level of prejudice which might not require reversal of a conviction may be sufficient to require reversal of a death penalty.

It was totally unnecessary and clearly contrary to the interests of the state in bringing convicted criminals to justice for the prosecutor to introduce this kind of hatred-engendering forensics. We cannot let the death penalty stand under these circumstances. The penalty judgment is reversed; and, the death penalty is vacated. The matter is remanded for a new penalty determination before a newly empaneled jury.