881 P.2d 1358 (1994)
Gerald Carter LANE, Appellant,
v.
The STATE of Nevada, Respondent.
No. 23825.
Supreme Court of Nevada.
September 29, 1994.
*1360 Michael R. Specchio, Public Defender, Janet Cobb Schmuck, and Jane McKenna, Deputy Public Defenders, Washoe County, for appellant.
Frankie Sue Del Papa, Atty. Gen., Carson City, Dorothy Nash Holmes, Dist. Atty., and Gary H. Hatlestad, Deputy Dist. Atty., Washoe County, for respondent.

OPINION
SHEARING, Justice.
On May 22, 1992, Gerald Lane and James Millhouse left a party and headed to downtown Reno. Lane brought a gun with him. After visiting several casinos, the men separated *1361 for about five minutes. When Millhouse next saw Lane, Lane was talking to Frederick Spruell. According to Spruell, Lane approached him at approximately 4:00 a.m. and, after asking him if he was looking for "something," asked him how much money he had. Lane then told Spruell to "give it up." When Spruell declined to do so, Lane shot him in the stomach and fled.
Millhouse testified that he heard a gunshot and that when Lane rejoined Millhouse, he told Millhouse that he had just shot a man. The two men then ran away. Millhouse was running ahead of Lane when a bicyclist rode past him. Millhouse heard another gunshot. The man on the bicycle was William Boone. According to Boone, he was riding home at approximately 5:00 a.m, carrying bags of groceries on his handlebars. He saw Millhouse in the bushes and rode across the street away from Millhouse. He then saw Lane standing in a driveway. Lane ran up behind Boone and yelled out to him. Lane then shot Boone in the right hand, whereupon Boone lost control of his bicycle and his groceries spilled out onto the ground. Boone stopped and Lane began to approach, but Lane was distracted by something and quickly ran away.
Millhouse testified that he saw Lane running toward him, yelling for Millhouse to join him. Millhouse claimed he said no, and went directly toward a cab and begged the cab driver to take him home. When the cab driver refused, Lane and Millhouse proceeded South on Virginia Street, stopped at a bar for a while, and eventually entered a different cab. Millhouse told the cab driver, Raymond Dunham, to drive to the Peppermill. Along the way, however, Lane told Dunham to drive to the nearby Lakeview Apartments.
When they arrived at the apartments, Millhouse prepared to pay the fare, but Lane pulled out the gun. Millhouse testified that he ran off at this point and seconds later heard gunshots. The police found the cab a short time later. Inside the cab was Dunham. He was dead. Dunham had been shot three times in the head from a position directly behind him.
According to Dorothy Moore, Lane arrived at her apartment, and told her that he had shot a cab driver in the head three times and taken money. He displayed the money to Moore and then went into the kitchen and washed the gun off in the sink. He then placed the gun in a potato chip bag and hid it underneath the bed until she told him she did not want it at her apartment.
Lane was arrested and convicted, pursuant to a jury verdict, of one count each of first degree murder with the use of a deadly weapon, robbery with the use of a firearm, attempted murder and attempted robbery with the use of a firearm. He was sentenced to death. Lane appeals from his judgment of conviction and sentence based on five theories.
First, Lane argues that the capital sentencing process was administered in a racially discriminatory manner in violation of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. Second, Lane claims he was denied a fair trial because the jury was not impartial. He claims that a juror improperly influenced the jury by reading certain materials to them, causing prejudice against Lane. Third, Lane asserts that the district court erred in denying Lane's motion to suppress statements made during interrogation because the statements were involuntary. Fourth, Lane states that he was denied a fair penalty hearing because the district court admitted evidence which violated NRS 176.015[1], and which was unduly prejudicial. Fifth, Lane argues that he was denied a fair penalty hearing because the district court allowed duplicative aggravating factors in the instructions given to the jury. We consider each of Lane's contentions in turn.

*1362 I. Equal Protection Challenge.

Lane asserts that the imposition of the death penalty denied him equal protection of the laws as guaranteed by the Fourteenth Amendment to the United States Constitution. He bases this contention on a survey he has provided to this court indicating that the Washoe County District Attorney's office has sought the death penalty in eighty percent of the cases involving a black defendant with no prior felony conviction whereas it has not sought the death penalty in eighty percent of the cases involving a white defendant with a prior felony conviction. Lane concludes from this survey that "[i]f accused of murder in Washoe County, it is better to be a white felon than a black with no prior felony convictions."
A defendant who alleges an equal protection violation has the burden of proving the existence of purposeful discrimination and a discriminatory effect. McCleskey v. Kemp, 481 U.S. 279, 292, 107 S.Ct. 1756, 1766-67, 95 L.Ed.2d 262 (1987). In McCleskey, the defendant, McCleskey, claimed that Georgia's capital punishment statute violated the Equal Protection Clause of the Fourteenth Amendment. 481 U.S. at 291, 107 S.Ct. at 1766. McCleskey presented a statistical study to demonstrate that race infected the administration of Georgia's statute in two ways. Id. First, he claimed that persons who murdered whites were more likely to be sentenced to death than persons who murdered blacks. Id. Second, McCleskey contended that black murderers were more likely to be sentenced to death than white murderers. Id.
The United States Supreme court stated that to prevail under the Equal Protection Clause, McCleskey had to prove that the decisionmakers in his case acted with a discriminatory purpose. Id. at 292, 107 S.Ct. at 1766-67. The Court further stated that while it had accepted statistics as proof of intent to discriminate in certain limited contexts  for example, in jury venire-selection and Title VII cases  a prosecutor's decision to seek the death penalty was significantly distinguishable from these other two contexts. Id. at 293-94, 107 S.Ct. at 1767-68. The Court stated:
[T]he policy considerations behind a prosecutor's traditionally "wide discretion" suggests the impropriety of our requiring prosecutors to defend their decisions to seek death penalties "often years after they were made." Moreover, absent far stronger proof, it is unnecessary to seek such a rebuttal, because a legitimate and unchallenged explanation for the decision is apparent from the record: McCleskey committed an act for which the United States Constitution and Georgia laws permit imposition of the death penalty.
Id. at 296-97, 107 S.Ct. at 1769 (citations omitted).
As in McCleskey, in the case at bar prosecutors who have exercised their discretion in seeking the death penalty would be required to defend their actions years after these decisions were made. Additionally, as in McCleskey, the prosecutor in this case had a legitimate and unchallenged explanation for his decision: Lane committed an act for which the United States Constitution and Nevada laws permit imposition of the death penalty. In McCleskey, the Court also stated, "Because discretion is essential to the criminal justice process, we would demand exceptionally clear proof before we would infer that the discretion has been abused." Id. at 297, 107 S.Ct. at 1770. No such "exceptionally clear proof" exists in this case.
Assuming, arguendo, that Lane's statistics are accurate, we must reject his equal protection challenge because his statistics fail to prove the existence of purposeful discrimination or that the prosecutor's discretion has been abused. After careful consideration of Lane's claim, we conclude that the statistical survey of eighty-six murder cases prosecuted by the Washoe County District Attorney's office is inadequate to support a conclusion that Washoe County intentionally seeks the death penalty in a racially discriminatory manner. The survey's fatal flaw is that it fails to demonstrate that black and white *1363 persons who are similarly situated are treated differently.
First, Lane's statistics do not sufficiently narrow the factors which weigh into the prosecutor's decision to seek the death penalty. While the survey does tend to show that the death penalty has been sought more often for black non-felons than for white felons, the survey fails to take into consideration the relative strengths and weaknesses of those eighty-six cases, the individual characteristics of the offenses, whether aggravating or mitigating circumstances were present or absent, the nature of the aggravating and mitigating circumstances, whether plea bargains were offered and accepted, and the individual characteristics and attitudes of each capital defendant.
Without such vital information, we cannot determine whether or to what extent race may have been implicated in the capital cases involved in the survey. We therefore have no basis for holding that there was a racially discriminatory purpose behind the Washoe County District Attorney's decision to seek the death penalty in this case.

II. Juror Misconduct.

During the jury deliberations, the trial judge received a note from several members of the jury informing the judge that one of the jury members, Tom Lacey, had informed the rest of the jury that he sells or sold marijuana and that he uses a published booklet "as his law and guidance in persuading his decisions." Directly prior to receiving this note, the trial judge had been informed by the bailiff that on the evening before, the bailiff had opened the door to the jury room to inquire if the jury wished to continue deliberating and found a juror reading a booklet entitled, "Citizens' Rule Book, A Jury Handbook" to the rest of the jury.
The district court read a passage from the booklet, part of which stated that a juror has the power, through a single vote of not guilty, to "nullify every rule or law that is not in accordance with the principles of natural, God-given, Common or Constitutional law." The record does not indicate what part of the booklet jurors heard. After consulting with the prosecutor and defense counsel, the district court conducted a hearing outside the presence of the jury. First, the district court questioned Lacey, who admitted having the booklet and stated that while he had not read it aloud, other jurors had read it to themselves. After questioning, the State requested that Lacey be removed from the jury. The defense did not object, and the request was granted. An alternate juror replaced Lacey.
The district court then questioned each of the remaining jurors separately. Each juror stated that Lacey had read from the booklet. The jury members also indicated that they were not influenced by Lacey or the booklet, that they would abide by their oaths as jurors, that they would follow the law as instructed, and that they would decide Lane's case based upon the facts and evidence adduced at trial. The district court also questioned the alternate replacing Lacey, who stated that she had seen the booklet because Lacey was showing it the day before, but that she had not read it. The alternate juror stated that she was not influenced by the booklet and would follow the district court's instructions of law.
Lane moved for a mistrial based on juror misconduct. The district court denied his motion and ordered the jury to start over with deliberations. The jury subsequently informed the district court that it reached unanimous guilty verdicts on all four counts twice, once with Lacey and a second time with the alternate juror. Thereafter, at the beginning of the penalty phase of Lane's trial, Lane moved for a new trial, arguing that Lacey concealed a bias during voir dire. The district court denied this motion. On appeal, Lane argues that he was denied a fair trial because the jury was not impartial, and that the district court erred in denying his motions for mistrial and for a new trial.
The denial of a motion for a mistrial is within the trial court's sound discretion, *1364 and that ruling will not be disturbed on appeal in the absence of a clear showing of abuse. Owens v. State, 96 Nev. 880, 883, 620 P.2d 1236, 1238 (1980). Lane contends that the jury expressed its hostility toward Lacey by convicting Lane; however, there is no evidence in the record indicating that Lacey was predisposed to acquitting Lane. Indeed, in issuing its guilty verdict, the jury stated that even with Lacey, it had unanimously found Lane guilty of all four counts. In light of this and the fact that upon questioning, the jurors stated that they had not been influenced by Lacey and would follow the law as instructed, we hold that the district court did not abuse its discretion in denying Lane's motion for a mistrial.
Regarding the district court's denial of Lane's motion for a new trial, we note at the outset that not every incidence of jury misconduct requires the granting of a motion for a new trial. Barker v. State, 95 Nev. 309, 313, 594 P.2d 719, 721 (1979). However, a new trial must be granted unless it appears, beyond a reasonable doubt, that no prejudice has resulted. Id. It is for the trial court to determine in the first instance whether juror misconduct has resulted in prejudice to a litigant, and its judgment thereon will not be overturned unless an abuse of discretion is manifest. Id. In the instant case, Lane contends that he was entitled to a new trial based on the theory that Lacey concealed bias during the voir dire. Lane's contention is without merit. Since Lacey was replaced with an alternate juror and since the other jurors were not influenced by Lacey, Lacey's views resulted in no prejudice to Lane. Therefore, the district court acted within its discretion in denying Lane's motion for a new trial. We hold that Lane was afforded a fair trial.

III. Admissibility of Lane's Statements.

During the trial, the state introduced, through Officer David Jenkins, inculpatory statements made by Lane during interrogation by police officers. Lane contends that the statements introduced by Officer Jenkins were involuntary. He states that he had been awake continuously for twenty-four hours prior to questioning and had been drinking heavily the previous day, that he was questioned for nearly two hours by three police officers, only consumed a candy bar and a Coca-Cola while in custody, and that he was not informed during questioning that he could contact a lawyer or friends.
This court will not disturb a district court's finding regarding the voluntariness of a confession unless that finding is plainly untenable. Robertson v. State, 97 Nev. 138, 139, 625 P.2d 565, 565 (1981); Boggs v. State, 95 Nev. 911, 913, 604 P.2d 107, 109 (1979). In determining whether a defendant's confession is voluntary, we consider the effect of the totality of the circumstances on the will of the defendant. Passama v. State, 103 Nev. 212, 213, 735 P.2d 321, 323 (1987). The question in each case is whether the defendant's will was overborne when he confessed. Id.
In the instant case, we hold that Lane's will was not overborne and that his statements were voluntary. During the suppression hearing, Officer Jenkins testified that there were no signs of intoxication when the officers questioned Lane and that aside from an occasional yawn, Lane did not demonstrate any signs of exhaustion. Officer Jenkins testified that Lane was lucid and coherent and that he never requested to speak with an attorney, friends or relatives. During the hearing and the trial, Officer Jenkins testified that he read Lane his Miranda rights prior to questioning. The "Admonition and Waiver of Rights" form bearing Lane's signature was introduced into evidence. Based on the foregoing, the district court's ruling, made after listening to testimony and to an audiotaped portion of the interrogation, was not "plainly untenable."

IV. The Penalty Phase.

A. Admissibility of Letters.

Hazel Dunham, sister of the victim, Raymond Dunham, testified during the penalty *1365 phase of Lane's trial. Through Hazel Dunham, the state introduced two letters into evidence, over defense counsel's objection. The first letter was from Carol Collins, R.N., the Procurement Coordinator for Intermountain Recovery System. This letter expressed Collins' condolences to Hazel Dunham and described the donor recipients for Raymond Dunham's organs. The second letter was from Raymond Dunham's friend, and described the ten year friendship between him and Dunham.
Lane argues that these letters were introduced in violation of NRS 176.015 and that they were unduly prejudicial. Lane's reliance on NRS 176.015 is misplaced. This court has held that NRS 176.015 is inapplicable to hearings where the death penalty is imposed. Hardison v. State, 104 Nev. 530, 535, 763 P.2d 52, 55 (1988).
The state argues that the statements were admissible under Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), and Homick v. State, 108 Nev. 127, 825 P.2d 600 (1992). In Payne, the United States Supreme Court overruled its prior cases which prohibited "victim impact" evidence during the penalty phase of a capital trial. The Payne court stated: "A State may legitimately conclude that evidence about the victim and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." 501 U.S. at 827, 111 S.Ct. at 2609. It therefore held that the federal constitution did not bar the admission of victim impact evidence and prosecutorial argument on that subject. Id. We lauded the Payne decision in Homick, and concluded that error did not result from the comments of a prosecutor during closing argument regarding the surviving members of the victims' families. 108 Nev. at 136-37, 825 P.2d at 606.
While the reasoning of Payne and Homick is relevant, a more specific provision governs the question of admissibility presented in the instant case. During the penalty phase of a case in which the death penalty is sought, NRS 175.552 governs the admissibility of evidence regarding the victim. See Hardison v. State, 104 Nev. 530, 763 P.2d 52 (1988). NRS 175.552 provides that during the penalty hearing of a first degree murder case, "evidence may be presented concerning aggravating and mitigating circumstances relative to the offense, defendant or victim and on any other matter which the court deems relevant to sentence, whether or not the evidence is ordinarily admissible." (emphasis added).
Questions of admissibility during the penalty phase of a capital murder trial are largely left to the discretion of the trial judge. Milligan v. State, 101 Nev. 627, 636, 708 P.2d 289, 295 (1985), cert. denied, 479 U.S. 870, 107 S.Ct. 238, 93 L.Ed.2d 163 (1986). There was not an abuse of discretion in this case. Moreover, even if admission of the two letters did constitute an abuse of discretion, we hold that in light of the five aggravating factors found by the jury, any error which resulted from their admission was harmless. See NRS 178.598.

B. Aggravating Circumstances.

In the case at bar, the jury found five aggravating circumstances.[2] Lane argues that he was denied a fair trial because the *1366 aggravating circumstances articulated by the district court and found by the jury were inconsistent and duplicative.
NRS 200.033 enumerates the circumstances by which murder of the first degree may be aggravated. Among the five aggravating circumstances found by the jury were that the murder was committed while Lane was engaged in the commission of or flight after robbery, NRS 200.033(4), and also that the murder was committed at random, without apparent motive. NRS 200.033(6). Lane argues that these two aggravating circumstances are inconsistent. However, we have held that if the killing was not necessary to accomplish the robbery or could have been completed without killing the victim, the two aggravating factors are not inconsistent. Paine v. State, 107 Nev. 998, 999-1000, 823 P.2d 281, 282 (1991); Bennett v. State, 106 Nev. 135, 143, 787 P.2d 797, 802 (1990), cert. denied, 498 U.S. 925, 111 S.Ct. 307, 112 L.Ed.2d 260 (1990). In the instant case, there was no indication that Lane had to kill Dunham in order to rob him; therefore, Lane's contention is without merit. Lane also asserts that the jury's findings that Lane committed murder while attempting to commit robbery and while engaged in the commission or flight after committing robbery, NRS 200.033(4), duplicate its finding that Lane committed the murder to "receive money or any other thing of monetary value." NRS 200.033(6). Lane states that a robbery or attempt to rob cannot be accomplished without trying to take money or some other thing of monetary value. This contention is also without merit.
In Guy v. State, 108 Nev. 770, 839 P.2d 578 (1992), cert. denied, ___ U.S. ___, 113 S.Ct. 1656, 123 L.Ed.2d 275 (1993), we rejected a challenge to a jury's finding that the murder was committed while the person was engaged in the commission of or an attempt to commit robbery and that the murder was committed to receive money or any other thing of monetary value. We stated that the evidence supported the aggravating factors: the appellant murdered the victim while robbing him and also for the purpose of obtaining cocaine, a thing of monetary value. Id. at 781, 839 P.2d at 585.
Additionally, this court has previously rejected an appellant's argument that since the felonies of burglary and robbery "arose out of the same indistinguishable course of conduct," they could not be stated as two separate aggravating circumstances. Bennett v. State, 106 Nev. 135, 142, 787 P.2d 797, 801, cert. denied, 498 U.S. 925, 111 S.Ct. 307, 112 L.Ed.2d 260 (1990). We stated that if the legislature intended to prohibit the use of multiple aggravating circumstances in this context, it would have provided accordingly. Id. at 143, 787 P.2d at 802. Therefore, we held that if a defendant can be prosecuted for each crime separately, each crime can be used separately as an aggravating circumstance. Id. at 142, 787 P.2d at 801.
In this case, although the two aggravating circumstances arose out of the same indistinguishable course of conduct, it appears that the legislature intended that they may be considered as two separate aggravating factors. We therefore find Lane's argument unpersuasive.
In reviewing death sentences, this court must consider whether the evidence supports the jury's findings of the aggravating circumstances. NRS 177.055(2)(b). In reviewing each of the five aggravating circumstances found by the jury, we conclude that one of the five is invalid. The second aggravating circumstance was found by the jury as follows:
The murder was committed while GERALD CARTER LANE was engaged in flight after attempting to commit robbery and GERALD CARTER LANE attempted to kill FREDERICK SPRUELL; or that he knew or had reason to know that life would be taken or lethal force used.
*1367 This finding is based on NRS 200.033(4), which provides:
4. The murder was committed while the person was engaged, alone or with others, in the commission of or an attempt to commit or flight after committing or attempting to commit, any robbery, sexual assault, arson in the first degree, burglary, invasion of the home or kidnapping in the first degree, and the person charged:
(a) Killed or attempted to kill the person murdered; or
(b) Knew or had reason to know that life would be taken or lethal force used.
As is evident, the jury's finding does not comport with the statutory requirements. NRS 200.033(4) requires a finding that the defendant "(a) Killed or attempted to kill the person murdered; or (b) Knew or had reason to know that life would be taken or lethal force used." The jury found disjunctively that Lane killed or attempted to kill Spruell, or knew or had reason to know that life would be taken or lethal force used. No evidence was presented that Lane "knew or had reason to know that life would be taken or lethal force used." Therefore, the jury could only find this aggravating circumstance if it found that Lane "killed or attempted to kill the person murdered," i.e., Dunham. Instead of supporting this aggravating circumstance with a finding that Lane killed or attempted to kill Dunham, the jury found that Lane attempted to kill Spruell. Thus, the jury found either an invalid aggravating circumstance or one that the evidence did not support. Accordingly, we hold that this aggravator may not stand.
However, we have carefully reviewed the evidence in this case and conclude that it supports the jury's finding of each of the remaining four aggravating circumstances. In light of the fact that no mitigating circumstances were found by the jury, we hold that the jury's finding of an invalid aggravating factor constituted harmless error. See Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990); Canape v. State, 109 Nev. 864, 859 P.2d 1023 (1993); Libby v. State, 109 Nev. 905, 859 P.2d 1050 (1993); see also NRS 200.030(4)(a). Such reweighing compels us to affirm Lane's death sentence.
In cases in which the death penalty is imposed, this court is also statutorily required to consider whether the death sentence was imposed under the influence of passion, prejudice or any arbitrary factor and whether the sentence of death is excessive considering both the crime and the defendant. NRS 177.055(2).
We conclude that the death sentence was not imposed under the influence of passion, prejudice or any arbitrary factor, nor was it excessive in this case. The jury sentenced Lane to death based upon the aggravating circumstances of the murder revealed during the trial. The jury found beyond a reasonable doubt that Lane killed Dunham by shooting him three times in the back of the head. This was a senseless and brutal murder, the culmination of a spree of violence and attempted robbery, during which Lane shot two others, one of whom was seriously injured. Considering the circumstances of the crime and the nature of Lane's character, the jury's determination that Lane should be put to death for the murder of Dunham was not excessive.
Having determined that Lane was fairly tried, convicted and sentenced, we affirm the district court's judgment of conviction and the sentence of death.
ROSE, C.J., and STEFFEN and YOUNG, JJ., concur.
SPRINGER, Justice, concurring in part and dissenting in part:
I concur in the affirmance of Lane's conviction for first-degree murder; I dissent from the affirmance of the death sentence in this case. That sentence is seriously flawed for two reasons: first, the district attorney charged the wrong aggravating circumstance, and therefore Lane is not death-eligible; second, Lane has raised a colorable *1368 claim that he is the victim of a racially-based discriminatory policy employed by the Washoe County District Attorney in death cases. That claim must be given full and proper hearing. I summarize these two points as follows:
1. This murder was committed during a robbery. NRS 200.033(4) provides that murder committed while a person is engaged in robbery is an aggravated murder. Lane is guilty of this kind of aggravated murder; but, strangely, he was not charged with committing murder while engaged in robbery. Instead, he was improperly and inappropriately charged with committing murder while engaged in flight from some unspecified robbery of some unspecified robbery victim.
2. Lane introduced evidence, which if established as fact, would tend to show that the Washoe County District Attorney's Office seeks the death penalty for black defendants with no prior felonies four times as often as it seeks the death penalty for previously-convicted white defendants. Although Lane has not claimed a deliberate discriminatory purpose on the part of the District Attorney's office, the evidence which Lane introduced below is troubling. I would remand the case for a hearing and reconsideration of the question of violation of Lane's right to equal protection of the law guaranteed to him by our State Constitution.

ABSENCE OF AGGRAVATING CIRCUMSTANCE EQUALS ABSENCE OF DEATH-ELIGIBILITY
The Majority Opinion in this case tells us that "[a]fter careful review of the evidence, we are convinced that it supports the jury's finding of each of these [five] aggravating [circumstances]." (Majority Opinion at 1365). My "careful review" tells me just the opposite  that there are no aggravating circumstances proven in this case. I will get rid of the easy ones first.
The first aggravator found by the jury, is that the "murder was committed by [Lane] who knowingly created a great risk of death to more than one person." (Instruction No. 9). Neither the jury instructions nor the jury findings specify who the jury believed to have been at "great risk of death" at the time Lane murdered Dunham. The only person other than the victim who was nearby at the time of the murder was Lane's friend and codefendant, Millhouse. When Lane pulled out his gun, Millhouse ran away; it thus seems impossible for Millhouse to have been at any risk of death, for, by the time Lane got around to committing the murder, Millhouse was not there. The "great-risk-of-death" aggravator must fail in this case.
The fourth aggravator found by the jury is that the "murder was committed upon one or more persons at random and without apparent motive." (Instruction No. 9). We know that the murder was not motiveless. We know what the motive was here; it was robbery, pure and simple. As stated in the Majority Opinion, Dorothy Moore testified that Lane "told her that he had shot a cab driver in the head three times and taken money." This looks a lot like a robbery to me  the motive, obviously, was to take the cabbie's money. The robbery was not "motiveless"; at least there is no evidence that this is the case. I certainly do not disagree with the proposition adopted by this court in Moran v. State, 103 Nev. 138, 143, 734 P.2d 712, 714 (1987), that a robbery can be committed and that there can still be an accompanying motiveless killing and, therefore, an aggravated murder. If the facts here were to have shown that Lane took the cabbie's money and then, for no apparent reason, shot him, we might have evidence to support the "motiveless" aggravator. The facts in this case do not, however, support a finding beyond a reasonable doubt that this killing was done other than in the course of a robbery. Unfortunately for the State, as I have said, the district attorney did not charge murder during robbery as an aggravator.
The jury found as the fifth aggravator that the "murder was committed by [Lane], for *1369 himself or another, to receive money or other thing of monetary value." (Instruction No. 9). This aggravating circumstance applies to contract killings, when murderers do their ugly deed in order "to receive money or other thing of monetary value," and it cannot be contorted to fit a robbery-murder, a special aggravating circumstance which is expressly provided for in NRS 200.033(4). If this aggravating circumstance equates with robbery-murder, then the separate robbery-murder aggravating circumstance contained in the statutory scheme would be redundant. Now on to the "hard" aggravators.
Aggravators 2 and 3 require that Lane have been "engaged in flight" from a robbery at the time of the murder of taxi-cab driver Dunham. NRS 200.033(4), the statute that describes the conditions under which "flight" might amount to an aggravating circumstance is to me extremely difficult to decipher, as is the flight instruction given to the jury in which the trial court tried to define the conditions under which the flight portion of NRS 200.033(4) applies. For ready reference, and to confirm the complexity of and the difficulty in understanding the statute and the findings of the jury verdict, I set these out in the margin.[1] The confusion inherent in the statute and jury findings aside, let me go ahead and see if it is possible to make any sense out of the "flight" aggravating circumstances that were found by the jury in this case. (I must say that I believe this task to be impossible.)
The first "flight" aggravator found by the jury (as aggravating circumstance 2) is necessarily based on the language in NRS 200.033(4) that the "murder was committed while [Lane] was engaged ... in the commission of or an attempt to commit or flight after committing or attempting to commit, any robbery" and that Lane "(a) Killed or attempted to kill the person murdered; or (b) Knew or had reason to know that life would be taken or lethal force used." Since I cannot understand what this statute says or means, I go on to read the actual finding of the jury made pursuant to this incomprehensible statutory language. The jury found that Lane killed the taxi driver, Dunham, "while GERALD CARTER LANE was engaged in flight after attempting to commit robbery[,] and GERALD CARTER LANE attempted to kill FREDERICK SPRUELL[ ] or that he knew or had reason to know that life would be taken or lethal force used." I have tried to make an effort to understand what the jury was trying to do when it concluded that an aggravating circumstance existed under NRS 200.033(4). The best that I could come up with was that the jury found:
1. Lane murdered Dunham "while [Lane] was engaged in flight after attempting to commit robbery" (of some unspecified person); or

2. Lane "attempted to kill FREDERICK SPRUELL"; or

3. Lane "knew or had reason to know that life would be taken or lethal force used."
How in the world is Lane or any one else expected to know just what Lane did to make *1370 him eligible for the death penalty? Is it because he murdered Dunham while he was engaged in flight after attempting to commit some unspecified robbery? Or was it because he "attempted to kill" Spruell? Or was it because he knew at the time he killed Dunham that a "life would be taken or lethal force [would be] used [by him]"? Aside from the impermissible multiplicity of alternate charges, NRS 200.033(4) does not mention an "attempt[ ] to kill"; and it is senseless to say that Lane committed aggravated murder because he "knew" that he, Lane, was going to take a life or use lethal force. This finding of an aggravating circumstance is farcical, and even if we were willing to isolate out of all the alternate possibilities "murder ... committed while ... engaged in flight after attempting to commit robbery," there is no specification as to what robbery the jury had in mind. Whatever robbery the jury might have been thinking about, it certainly looks to me as though Lane's robbery-murder of Dunham was an isolated event, which he did on his own for the usual purpose that motivates robbers. Even, if some readers are able to make sense out of either NRS 200.033(4) or jury finding 2, and even if we ignore the multiple possible bases for the finding, absent a specification of whom Lane is charged with robbing and absent any evidence that Lane was fleeing from another robbery at the time he robbed and murdered Dunham, a jury finding that, beyond a reasonable doubt, Lane is guilty of committing this amorphous "aggravating circumstance" cannot stand.
That no one at the trial of this case could see that the only real aggravating circumstance in this case is robbery and not flight is a matter of some amazement to me. Under NRS 200.033(4) an aggravating circumstance may be present when the "murder was committed while the person was engaged, alone or with others, in the commission of ... any robbery." It is quite clear that the murder here was committed not while Lane was engaged in flight from a robbery but, rather, in the actual commission of a robbery. Murder committed during a robbery is the only appropriate aggravating circumstance in this case and the one that should have been given to the jury.
Strangely, the State did not charge that the murder was committed while Lane was engaged in the commission of a robbery; rather, the State charged that Dunham's murder was committed while Lane was "engaged in flight" from some other, unspecified robbery or attempted robbery. I cannot even begin to guess why the prosecution did this. It is clear that Lane committed murder during a robbery. It is equally clear that Lane did not commit murder during flight. At the time he decided to rob Dunham, Lane and his friend, Millhouse, were traveling together by taxi on their way to Lakeview Apartments. Lane decided to rob the taxi driver and then, apparently, to kill him. It is too bad that the State did not charge murder during the course of a robbery as an aggravator, because such an aggravator is clearly present here.
Finally, with regard to the second "flight aggravator," aggravating circumstance number 3, I confess that I can make no sense of it at all. The jury did find, among other findings in number 3, that Lane was guilty of a "murder ... committed while [Lane] was engaged in the commission of or flight after committing robbery." It is hard to distinguish this from number 2 discussed above, and if number 2 were to stand, number 3 should be disallowed as being duplicitous. The jury made a number of additional findings to support this single aggravating circumstance, including the finding that "[Lane] killed RAYMOND DUNHAM[] or that he knew or had reason to know that life would be taken or lethal force used." This latter finding is, of course, of no consequence. Lane cannot, obviously, be punished for both shooting and killing Dunham and, additionally, for knowing that there was going to be "lethal forced used" in his killing of Dunham. The jury instructions and the jury findings result in two "engaged-in-flight" aggravators *1371 which are terribly confusing and have no support in the record, much less support beyond a reasonable doubt.[2]
Since there are no properly found aggravating circumstances, I must conclude that Lane is not death-eligible; therefore I would reverse his death sentence.

THE RACIAL IMPACT STATISTICS
Lane brought a motion in district court to preclude the prosecution from seeking the death penalty in this case. Lane claims that the Washoe County District Attorney's office, as a general practice, discriminatorily seeks the death penalty much more frequently *1372 when the defendant in a murder case is black. In support of this charge, Lane presented to the trial court a survey covering some eighty-six murder cases prosecuted by the Washoe County District Attorney's office. In approximately eighty-percent of cases involving a white defendant with at least one prior felony conviction, the district attorney did not seek the death penalty. By contrast, in approximately eighty-percent of cases involving a black defendant without prior felony convictions, the district attorney did seek the death penalty.
The district court held an evidentiary hearing and after considering the defendant's statistical data, ruled against Lane based on the United States Supreme Court case of McClesky v. Kemp, 481 U.S. 279, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1986), which requires that a criminal defendant who seeks to assert a Federal Equal Protection clause violation must prove that the prosecuting authorities acted with discriminatory purpose in that particular case. Even assuming the district court's ruling to be correct under federal law, I remain very much concerned that the Washoe County District Attorney's office seeks the death penalty for only one out of five white murderers with past felonies and seeks the death penalty for four out of five black murderers without prior felonies. McClesky may or may not foreclose any avenue of federal relief for Lane; nevertheless, I do not see how this court can ignore the raw data that four out of five black non-felons face the death penalty and four out of five white felons do not.[3] If these facts can be explained, well enough; however, they ought not simply be brushed aside. Naturally, I understand that prosecutors consider other damning factors than past felonies in making the decision to seek the death penalty; still, on its face, it does not seem right or even statistically feasible that four times as many black defendants without felony records would be deserving of the death penalty.[4]
In State Farm v. All Electric, Inc., 99 Nev. 222, 224-225, 660 P.2d 995, 997 (1983), this *1373 court declared that "[w]e have previously held that the standard for testing the validity of legislation under the equal protection clause of the state constitution is the same as the federal standard." The court relied upon Laakonen v. District Court, 91 Nev. 506, 538 P.2d 574 (1975) for this proposition. Laakonen, in fact, contained no express statement of this rule, but merely applied the two clauses in an identical fashion. Although I dissented in the State Farm case, I agreed with this analysis of our state equal protection clause because I saw "no reason to depart from that view in the immediate case." State Farm, 99 Nev. at 231, 660 P.2d at 1002 (Springer, J., dissenting) (emphasis added). I now see such a reason.
Nevada's so-called "equal protection" clause, article 4, section 21, of the Nevada Constitution, reads quite differently from its federal counterpart: "In all cases enumerated in the preceding section, and in all other cases where a general law can be made applicable, all laws shall be general and of uniform operation throughout the State." The Fourteenth Amendment's Equal Protection clause provides: "No state shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const., Fourteenth Amendment. Given the plain and significant differences in the language utilized in these respective clauses, it is reasonable to conclude that the framers of the Nevada Constitution did not intend to mirror the Federal Constitution. Significantly, the voters of the Territory of Nevada approved the Nevada constitution in September 1864, some two years before the Fourteenth Amendment was even proposed. See generally Official Report of the Debates and Proceedings in the Constitutional Convention of the State of Nevada (Andrew J. March, ed. 1886). Furthermore, in the long history of this State, the judicial practice of reading article 4, section 21 in lock-step with the Federal Constitution is a relatively recent phenomenon. Compare State ex re. Ash v. Parkinson, 5 Nev. 15 (1869), and State ex rel. Clarke v. Irwin, 5 Nev. 111 (1869), with State Farm Fire and Cas. Co. v. All Elec., Inc., 99 Nev. 222, 660 P.2d 995 (1983). Although this court has never before determined the question of whether, like its federal counterpart, article 4, section 21 requires that a defendant in a criminal case show a discriminatory purpose on the part of the State, the strong possibility that Lane was treated in a discriminatory way is too important to brush aside on the authority of the State Farm case.[5]
The question that I believe should be addressed is: what does Nevada's constitution require in terms of equality for its citizens? Under the State Constitution the legislature does not have the power to pass laws which invidiously discriminate on their face. In its earliest days, this court held that article 4, section 21 was intended to prevent special parochial laws, designed to benefit only local interests. See, e.g., Evans v. Job, 8 Nev. 322 (1873). The court did, upon occasion, define the constitutional mandate in broader, more elastic terms. See Ex Parte Spinney, 10 Nev. 323, 330 (1875) ("the object of [article 4, section 21] was the prevention of unfair discrimination between citizens, and to secure to every one the enjoyment of the same privileges which are enjoyed by others similarly circumstanced"). But, nonetheless, the vast bulk of our early cases, like Evans v. Job, address only the question of whether a particular statute is de jure "unequal" or "not uniform." See State v. Consolidated Va. Mining Co., 16 Nev. 432 (1882); Quilici v. Strosnider, 34 Nev. 9, 115 P. 177 (1911). The more pernicious problem of facially neutral statutes with discriminatory effects has been, for the most part, ignored. Spinney, 10 Nev. at 334 ("the form of the law, and not its *1374 object or purpose, [is] the test of constitutionality").
The more recent cases involving article 4, section 21, of the Nevada Constitution have shown this court's willingness to look beyond the facial neutrality of a law to its discriminatory effect as applied. For example, in Turner v. Staggs, 89 Nev. 230, 235, 510 P.2d 879, 882 (1973), this court overturned on constitutional grounds a statute whose "stated object" was neutral, but which had "the effect of arbitrarily dividing all tort-feasors into classes of tort-feasors...." This should not be a surprising development since the plain language of our constitution invites this very inquiry through the phrase, "uniform in operation."
No one has, as yet, had occasion to consider whether Nevada's constitution requires proof of discriminatory purpose before the court will act to remedy a discriminatory effect, or whether such a purpose can only be shown by proof that a state actor chose a particular action because of its discriminatory effects rather than in spite of them.[6] I am not convinced that, under the Nevada Constitution, a criminal defendant cannot claim that he is being discriminated against unless he can prove that state agents were acting with a formed intent to discriminate against him or her. As Justice Blackmun recently observed, it is weighty work to "tinker with the machinery of death"  work that should give one pause before choosing to discard the kind of statistical evidence that Lane has put before the district court. Callins v. Collins, ___ U.S. ___, ___, 114 S.Ct. 1127, 1130, 127 L.Ed.2d 435 (1994) (Blackmun, J., dissenting). Justice Blackmun further observed that "[e]ven under the most sophisticated death penalty statutes, race continues to play a major role in determining who shall live and who shall die." Callins, ___ U.S. at ___, 114 S.Ct. at 1135. It appears to me that race may play a major role in Washoe County when the district attorney makes the decision as to "who shall live and who shall die." I would reverse the case and remand it to the trial court for further examination of whether, irrespective of the prosecutor's subjective motive or intent, the death penalty is being sought by Washoe County prosecutors on a racially disproportionate basis in violation of article 4, section 21 of the Nevada Constitution.

DEATH-SENTENCING PROCESS
Before concluding my dissent, I wish to comment again on the death-sentencing process in Nevada.
In Canape v. State, 109 Nev. 864, 859 P.2d 1023 (1993), this court, against my vigorous objection, categorized Nevada as a "weighing state" and approved an instruction that the death-sentencing jury must determine "(a) Whether an aggravating circumstance or circumstances are found to exist; and (b) Whether a mitigating circumstance or circumstances are found to exist; and (c) Based upon these findings, whether the defendant should be sentenced to life imprisonment or death." Id. at 877 n. 7, 859 P.2d 1032 n. 7 (my emphasis).
The majority in Canape ruled that it was proper, in accordance with Clemons v. Mississippi, 494 U.S. 738, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990), for appellate courts "in `weighing' States, to consider whether the evidence is such that the sentencer could have arrived at[[7]] the death sentence that was imposed." Id. at 882, 859 P.2d at 1034 *1375 (emphasis added) (quoting Clemons, 494 U.S. at 748-49, 110 S.Ct. at 1448). I assume, therefore, that it is safe to say that in a weighing state, the sentencer arrives at the death sentencing by weighing. As I argue in my Dissent in Canape, our statutes do not provide that sentencers must arrive at the death decision by way of a weighing process. The idea that Nevada is a weighing state is a judicial invention by this court; but, still, even if Nevada is proclaimed by this court to be a weighing state, it is impossible to tell from reading the Majority Opinion in Canape whether death-sentencers are supposed to "arrive at" the death sentence by weighing aggravating circumstances against mitigating circumstances, or are, instead, first to find the defendant to be "death eligible" and then "in its discretion ... [to] consider the sentence of death as an option." Id. at 882, 859 P.2d at 1035.
As I explain in my Dissenting Opinion in Canape, it makes a very big difference as to whether the sentencer arrives at its life-death decision on the basis of having weighed aggravating circumstances against mitigating circumstances or engages in discretionary sentencing after first finding death eligibility.[8]
Unlike Richard Canape, Gerald Lane was not subjected to a jury instruction that told his sentencing jury that "based on ... findings" relating to aggravating circumstances, the sentencing jury must "determine ... whether the defendant should be sentenced to life imprisonment or death." Id. at 893, 859 P.2d at 1042 (Springer, J., dissenting) (emphasis added) (quoting NRS 17.554(2)(c)). On the contrary, the Lane jury was correctly instructed that after a finding of death eligibility, it was free to exercise its discretion on the life or death issue and was not required to "arrive at" its decision "based upon" any findings relating to aggravating and mitigating circumstances or by "weighing" these circumstances against each other.[9]

CONCLUSION
I would reverse the sentence of death in this case because Lane is not death eligible as a result of the prosecutor's failure to charge the only aggravator the evidence supports  robbery, and because Lane raises a colorable claim that he is the victim of a racially-based discriminatory policy employed by the Washoe County District Attorney in death cases.
NOTES
[1] NRS 176.015 states in pertinent part:

3. Before imposing sentence the court shall afford the victim an opportunity to:
(a) Appear personally or by counsel; and
(b) Reasonably express any views concerning the crime, the person responsible, the impact of the crime on the victim and the need for restitution.
[2] The five aggravating circumstances consisted of the following:

1. The murder was committed by Lane who created a great risk of death to more than one person by means of a weapon or course of action which would normally be hazardous to the lives of more than one person. NRS 200.033(3).
2. The murder was committed while Lane was engaged in flight after attempting to commit robbery, and Lane attempted to kill Frederick Spruell; or that he knew or had reason to know that life would be taken or lethal force used. NRS 200.033(4).
3. The murder was committed while Lane was engaged in the commission or flight after committing robbery, and Lane killed Raymond Dunham; or that he knew or had reason to know that life would be taken or lethal force used. NRS 200.033(4).
4. The murder was committed upon one or more persons at random and without apparent motive. NRS 200.033(9).
5. The murder was committed by Lane for himself or another to receive money or other thing of monetary value. NRS 200.033(6).
[1] NRS 200.033(4) provides:

4. The murder was committed while the person was engaged, alone or with others, in the commission of or an attempt to commit or flight after committing or attempting to commit, any robbery, sexual assault, arson in the first degree, burglary, invasion of the home or kidnaping in the first degree, and the person charged:
(a) Killed or attempted to kill the person murdered; or
(b) Knew or had reason to know that life would be taken or lethal force used.
The second and third aggravating factors were found by the jury in this form:
2. The murder was committed while GERALD CARTER LANE was engaged in flight after attempting to commit robbery and GERALD CARTER LANE attempted to kill FREDERICK SPRUELL; or that he knew or had reason to know that life would be taken or lethal force used.
3. The murder was committed while GERALD CARTER LANE was engaged in the commission of or flight after committing robbery and GERALD CARTER LANE killed RAYMOND DUNHAM; or that he knew or had reason to know that life would be taken or lethal force used.
(Instruction No. 9). Neither sentence 2 nor sentence 3 makes very much sense to me; certainly, they do not present cogent or coherent jury findings that would properly support a verdict of death.
[2] The two "flight" aggravators (2 and 3), apparently based on NRS 200.033(4), are a garbled mess. Before making an attempt to parse the complex sentence which comprises NRS 200.033(4), I want again to point out that the sentence does provide an understandable description of an aggravating circumstance comprised of a "murder ... committed while the person was engaged ... in the commission of ... any robbery." A person of ordinary intelligence would probably be able to extract from this compound sentence the idea that if one commits murder while engaged in the commission of a robbery (or any of the six other predicate crimes listed in the sentence), that this would be enough to constitute an aggravating circumstance and make a first degree murderer eligible for the death penalty. This is as far as I can go, however, the rest of the sentence makes no sense to me.

With regard to the part of the sentence relating to "flight," I find it most difficult to read. We know that first degree murder is aggravated when "committed to avoid or prevent a lawful arrest or to effect an escape from custody" NRS 200.033(5); and if there had been evidence here that Lane's "flight" was directed toward preventing his arrest, then perhaps the prosecution could have relied on NRS 200.033(5) to establish an aggravating circumstance. It cannot, however, in my opinion, rely on NRS 200.033(4) because it is too difficult to understand what the prohibited conduct might be and because whatever the statute was intended to mean, there is insufficient evidence of the kind of "flight" that the statute might be trying to describe.
When we extract the only truly intelligible language in NRS 200.033, "murder committed while engaged in robbery" (and other listed crimes), here is what we have left:
The murder was committed while the person was engaged ... in ... flight after committing or attempting to commit any robbery, [or the other listed crimes], and the person charged:
(a) Killed or attempted to kill the person murdered; or
(b) Knew or had reason to know that life would be taken or lethal force used.
After careful reading and diagramming, the best I can do with it is to extract the following meaning: First, to be aggravated murder under this provision, a murder must be committed by a person engaged in flight after committing robbery (or one of the other listed offenses). Second, the person fleeing from the robbery (or other listed crime) scene must either kill or attempt to kill "the person murdered," or have reason to know that life would be taken or lethal force used. With regard to the second element, I imagine that it can be safely said that Lane "killed ... the person murdered." The victim is dead; so Lane did kill the person murdered. So we have to inquire only into the part of the statute relating to murder while Lane was engaged in flight. Assuming that a reader of the statute can extract the meaning that murder is aggravated if committed during flight from the scene of a previous robbery (or other serious crime), there is no evidence in this record to support proof beyond a reasonable doubt that Lane engaged in such conduct.
I would comment first that it takes the proverbial Philadelphia lawyer to extract an intelligible flight aggravator from all of this confusing language. Lane should not be expected to understand what the charge was. What the jury actually did find is even more confusing than the statutory language. ("The murder was committed while GERALD CARTER LANE was engaged in flight after attempting to kill FREDERICK SPRUELL; or that he knew or had reason to know that life would be taken or lethal force used."). Even if this were not gibberish, this kind of disjunctive language violates well established norms of criminal procedure. "[A]bsent a statute providing otherwise, it is fatal for an indictment or information to charge disjunctively in the words of the statute, if the disjunctive renders it uncertain as to which alternative is intended." 2 Wharton's Criminal Procedure, § 266 at 131 (Charles E. Torcia, ed.; 13th ed. 1990) (footnote omitted). See, e.g., The Confiscation Cases, 87 U.S. (1 Wall.) 92, 22 L.Ed. 320 (1874); In Re Bell, 19 Cal.2d 488, 122 P.2d 22 (1942). This rule is designed to ensure that a criminal defendant has adequate notice of the charges being brought against him or her and because "neither a conviction nor an acquittal could be pleaded in bar to a subsequent prosecution on one of the several offenses." The Confiscation Cases, 87 U.S. at 104. But I am going to leave this aside and simply rest my dissent on the fact that in both of the findings of aggravating circumstances relating to flight, the findings relate either to Lane's "attempting to commit robbery" or to his "committing robbery"; but there is no accusation as to whom Lane might have robbed or attempted to rob. Without further accusational specification, I would conclude that the "flight" aggravator must fail.
[3] Racial impact statistics are receiving increasing attention from legislators and members of the Bar. For example, the United States Congress is currently considering the Racial Justice Act which addresses racial disparities in the imposition of the death sentence. A study conducted by the General Accounting Office is also aimed at ferreting out this pernicious problem. See United States General Accounting Office, Report to the Senate and House Committees on the Judiciary, Death Penalty Sentencing: Research Indicates Pattern of Racial Disparities (1990).
[4] The prosecutorial decision to seek the death penalty is, by nature, one involving a high degree of discretion. The major factors in deciding whether one guilty of aggravated murder deserves to be executed are the aggravated, extra-culpable nature of the killings and the past criminal activity of the murderer. A murderer who has been guilty of past felonious conduct presents a more death-worthy candidate for execution. A murderer who has been guilty of past violent felonies is by virtue of this "aggravating circumstance" eligible for the death penalty (provided, of course, that the jury is able to make the additional and problematical finding that mitigating circumstances do not outweigh aggravating circumstances). In any event, a prosecutor's decision to seek the death penalty is strongly supported by the fact of a defendant's having led a past life of crime. Thus it is these sorts of distinctions that would need to be explored on remand.

There are two ways that one can look at Lane's actions on the night of this murder. One is to see him as a drug-crazed maniac who, blindly and without being aware of what he was doing, wandered around shooting at people at random. The other is to see him as a calculating, cold-blooded murderer who remorselessly killed a taxi driver in order to rob him of a few dollars. Certainly there is evidence to support the latter perception, and the district attorney cannot be faulted, in this case, for seeking the death penalty, unless, as a matter of practice, it can be shown that this prosecutor favors white murderers over black murderers when it comes to deciding whether or not to seek the death penalty. If it were, for example, to be shown that the prosecutor sought death in all cases of black murderers and in no cases involving white murderers, one would be forced to listen to a black defendant's complaint that the only reason that he was singled out for the death penalty was the color of his skin. The same would probably be true if ninety percent of black defendants faced death and only ten percent of white defendants did. Here we appear to have a twenty percent, eighty percent, ratio, but we have the added factor that the eighty percent of white defendants who did not have to face death had past felony records while the eighty percent of black defendants who did have to face the death penalty did not have felony records. It begins to appear that the black defendants suffer from this discrepancy because of their race.
[5] The Majority concludes that there were simply too many factors involved, in the cases which formed the basis of the statistical survey, for that survey to be compelling. Indeed, a full evidentiary hearing on remand might prove that to be the case; however, it is clear from the transcript that the district court was focusing on the relevant federal precedent and, accordingly, did not give the statistics any weight. Otherwise, I am sure the district court would have explored the basis of the statistics through proper evidence rather than simply relying on assertions of counsel from memory.
[6] Of course I do not suggest that the district court was obligated to perform such a state constitutional law analysis because Lane limited his motion to the Fourteenth Amendment of the United States Constitution. This court does not hesitate, however, to consider questions of constitutional magnitude even when they were not raised below. McCullough v. State, 99 Nev. 72, 657 P.2d 1157 (1983).
[7] In Dawson v. State, 103 Nev. 76, 80-81, 734 P.2d 221, 223 (1987), this court used similar language indicating that a death sentencer must "weigh[ ] the mitigating circumstances to arrive at a final decision as to whether the defendant shall live or die." This is "weighing state" language and tells the world that in Nevada the death sentence is "arrived at" by way of a "weighing process."
[8] "Death eligibility" is determined under NRS 200.030 "only if one or more aggravating circumstances are found" and if "mitigating ... circumstances ... do not outweigh the aggravating... circumstances." NRS 200.030(4)(a); see Canape, supra (Springer, J., dissenting).
[9] The trial judge made it clear to the jury that it must first find the defendant eligible for the death penalty by finding (1) "that there is at least one aggravating circumstance" and (2) "that any mitigating circumstances do not outweigh the aggravating circumstances." (Instruction No. 9). The trial judge went on to define the term "outweigh" as denoting "a qualitative, not a quantitative, standard" and further explained that "even if the aggravating circumstances outnumber the mitigating circumstances you may still elect not to impose the death penalty." (Instruction No. 15.)

The trial judges's instructions to the jury make it very clear that the jury "may impose a sentence of death only if it finds, beyond a reasonable doubt," that the two death-eligibility conditions (at least one aggravator and a qualitative judgment that mitigating circumstances do not outweigh aggravating circumstances) are met. (Instruction No. 9; my emphasis). The trial judge further properly explained to the jury that "[u]ltimately, the discretion of whether to impose the death penalty belongs to the jury." (Instruction No. 9).
The instructions given to the jury in this case make it clear that two death-eligibility conditions must be met before a jury "may" exercise its "discretion of whether to impose the death penalty." It is eminently clear from these instructions that the jury is to "arrive at" a death penalty verdict by using a broad exercise of discretion and not merely by mechanically putting aggravating circumstances and mitigating circumstances on a scale and determining which "outweighs" the other. The jury was, wisely and properly, not instructed that it must "weigh" aggravating circumstances against mitigating circumstances and that "based on these findings" alone it must arrive at its life-death determination. I commend the trial judge for her perspicacity in giving perhaps the best possible instructions under a less-than-clearly-worded death sentencing statute. Had the Canape jury been instructed in this way, I might not have found it necessary to dissent.